# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | |
|---|---|
| THESLET BENOIR and CLEMENE BASTIEN, a married couple; and EBEN-EZER HAITIAN FOOD TRUCK LLC, | |
| *Plaintiffs*, | |
| v. | Civil Case No. 2:24-cv-00064-AWA-LRL |
| TOWN OF PARKSLEY, VIRGINIA; and HENRY NICHOLSON, in his official and individual capacities, | |
| *Defendants*. | |

---

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

TABLE OF EXHIBITS...................................................................................................... iv

TABLE OF AUTHORITIES............................................................................................. vi

INTRODUCTION .............................................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................... 1

    General Background .................................................................................................. 1

    The Events of June 16, 2023 ..................................................................................... 4

    The Events of June 17, 2023 ..................................................................................... 7

    Nicholson was Not the Only Problem ...................................................................... 9

    The Food Truck Ban ................................................................................................ 10

    The Town Government Retaliated Against Plaintiffs ....................................... 11

STANDARD OF REVIEW .............................................................................................. 17

ARGUMENT ..................................................................................................................... 18

    I.    Summary Judgment Should Be Entered Against Defendant Nicholson in his Personal Capacity for Cutting Plaintiffs' Pipe ..................................................... 18

        A.  Defendant Nicholson violated both the U.S. Constitution and Virginia law .. 18

        B.  Defendant Nicholson is personally liable ....................................................... 19

            i.    Federal Qualified Immunity Does Not Apply Here ........................... 20

                a. Nicholson's acts were outside the scope of his authority ............... 20

                b. Nicholson violated clearly established precedent .......................... 22

                c. Nicholson's violations were obvious ............................................. 23

            ii.  Virginia's State Law Immunities Do Not Apply Here Either ............ 24

    II.   Summary Judgment Should Be Entered Against Defendant Parksley and Defendant Nicholson in his Official Capacity for Cutting Plaintiffs' Pipe.......... 25

III.   Summary Judgment Should Be Entered Against Defendant Parksley for
        Retaliating Against Plaintiffs ............................................................................ 26

        A.  Parksley Retaliated Against Plaintiffs for Their Speech ................................ 26

        B.  Defendant Parksley is Liable for Retaliation Under *Monell* ........................... 29

CONCLUSION ............................................................................................................... 30

# TABLE OF EXHIBITS

| 1 | Frank Russell First Deposition |
|---|---|
| 2 | Lauren Lewis First Deposition |
| 3 | Mark Layne Deposition |
| 4 | Janice Welch Deposition |
| 5 | Richard Taylor Deposition – Two Volumes |
| 6 | Michael McCready Deposition |
| 7 | Frank Welch Deposition |
| 8 | Henry Nicholson Deposition |
| 9 | Bradley York Deposition |
| 10 | Frank Russell Second Deposition |
| 11 | Lauren Lewis Second Deposition |
| 12 | Parksley Town Charter |
| 13 | DEF000195 – Food Truck Picture |
| 14 | DEF000185 – PVC Pipe Picture |
| 15 | PLS00070 – Cut PVC Pipe Picture |
| 16 | William Pfeiffer Deposition |
| 17 | Oct. 9, 2023 Food Truck Ordinance |
| 18 | Audio Recording of September 2023 Parksley Town Council Meeting |

| 19 | WBOC Article: "Food Truck Stirs up Small Town Debate in Accomack County" |
|----|------------------------------------------------------------------------|
| 20 | DEF000394–95 – Oct. 19, 2023 Lewis & Wiggins Email |
| 21 | DEF000044 – Oct. 18, 2023 Lewis, Welch & Russell Email Exchange |
| 22 | DEF000046 – Oct. 20, 2023 Lewis, Russell & Layne Email Exchange |
| 23 | DEF000047 – Oct. 30, 2023 Russell, Taylor & Lewis Email Exchange |
| 24 | DEF000404–5 – Oct. 27, 2023 Wiggins & Lewis Email Exchange |
| 25 | DEF000418 – Oct. 27, 2023 Lewis & Wiggins Email Exchange |
| 26 | DEF000422–27 – Oct. 30, 2023 Monel Email, Monel Letter, and Wiggins & Lewis Email Exchange |
| 27 | Nov. 2, 2023 Letter from IJ |
| 28 | Nov. 2, 2023 Email from IJ |
| 29 | DEF000456 – Nov. 2, 2023 Lewis, Janice Welch, Frank Welch & Layne Email Exchange |
| 30 | Nov. 3, 2023 Wiggins Letter |
| 31 | DEF000460 – Nov. 3, 2023 Lewis & Wiggins Email Exchange |
| 32 | Dec. 12, 2022 Parksley Town Council Minutes |

# TABLE OF AUTHORITIES

<u>Cases</u>

*Adams v. Ferguson*,
884 F.3d 219 (4th Cir. 2018) ................................................................................ 22

*Alexander v. Holden*,
66 F.3d 62 (4th Cir. 1995) .................................................................................... 21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................... 17

*Bogan v. Scott-Harris*,
523 U.S. 44 (1998) ................................................................................................. 21

*Brown ex rel. Lawhorn v. Elliott*,
876 F.3d 637 (4th Cir. 2017) ................................................................................ 20

*Constantine v. Rectors & Visitors of George Mason Univ.*,
411 F.3d 474 (4th Cir. 2005) ......................................................................... 27, 28

*Cromartie v. Billings*,
298 Va. 284, 837 S.E.2d 247 (2020) ..................................................................... 24

*Davison v. Rose*,
19 F.4th 626 (4th Cir. 2021) ................................................................................. 20

*DeChene v. Smallwood*,
226 Va. 475, 311 S.E.2d 749 (1984) ..................................................................... 24

*Garrett v. Clarke*,
74 F.4th 579 (4th Cir. 2023) ................................................................................. 22

*Gowen v. Winfield*,
130 F.4th 162 (4th Cir. 2025) ............................................................................... 17

*Hill v. Borough of Kutztown*,
455 F.3d 225 (3d Cir. 2006) .................................................................................. 29

*Horton v. California*,
496 U.S. 128 (1990) ............................................................................................... 23

*Hupp v. Cook*,
931 F.3d 307 (4th Cir. 2019) ................................................................................ 24

*In re Allen*,
   106 F.3d 582 (4th Cir. 1997) ........................................................... 20, 21, 22

*Jordan v. Shands*,
   255 Va. 492, 500 S.E.2d 215 (1998) ........................................................... 24

*Katz v. United States*,
   389 U.S. 347 (1967) ........................................................... 22, 23

*Lo-Ji Sales, Inc. v. New York*,
   442 U.S. 319 (1979) ........................................................... 21

*Messina v. Burden*,
   228 Va. 301, 321 S.E.2d 657 (1984) ........................................................... 24

*Monell v. Dep't of Soc. Servs.*,
   436 U.S. 658 (1978) ........................................................... 25, 26, 29, 30

*Rambert v. City of Greenville*,
   107 F.4th 388 (4th Cir. 2024) ........................................................... 23

*S.C. State Bd. of Dentistry v. FTC*,
   455 F.3d 436 (4th Cir. 2006) ........................................................... 19, 25

*Soldal v. Cook County*,
   506 U.S. 56 (1992) ........................................................... 23

*Spell v. McDaniel*,
   824 F.2d 1380 (4th Cir. 1987) ........................................................... 25, 26, 29

*St. Maron Props., L.L.C. v. City of Houston*,
   78 F.4th 754 (5th Cir. 2023) ........................................................... 29

*Stanton v. Elliott*,
   25 F.4th 227 (4th Cir. 2022) ........................................................... 22

*Suarez Corp. Indus. v. McGraw*,
   202 F.3d 676 (4th Cir. 2000) ........................................................... 27

*Taylor v. Riojas*,
   592 U.S. 7 (2020) ........................................................... 23

*Tobey v. Jones*,
   706 F.3d 379 (4th Cir. 2013) ........................................................... 27

*Torres v. Madrid,*
    592 U.S. 306, 318 (2021) ........................................................................... 18, 23

*Valentino v. Vill. of S. Chi. Heights,*
    575 F.3d 664 (7th Cir. 2009) ............................................................................ 29

*Vines v. Branch*,
    244 Va. 185, 418 S.E.2d 890 (1992) ................................................................. 19

*Wai Man Tom v. Hosp. Ventures LLC,*
    980 F.3d 1027 (4th Cir. 2020) .......................................................................... 17

Constitutional Provisions

U.S. Const. amend. I ........................................................................................... 27, 28

U.S. Const. amend. IV ........................................................................................... *passim*

U.S. Const. amend. XIV ........................................................................................ *passim*

Va. Const. art. III, § 1 ............................................................................................... 21

Statutes

Va. Code Ann. § 15.2-1534 .................................................................................. 21, 22

Va. Code Ann. § 15.2-1400 ....................................................................................... 21

Rules

Fed. R. Civ. P. 56(a) .................................................................................................. 17

Other Authorities

Esurance Advertisement, *available at* https://www.youtube.com/watch?v=Aq_1l316ow8 ......... 22

## INTRODUCTION

In the famous words of John Adams, our republic is "a government of laws, not of men." At all levels of our government, officials owe a tremendous responsibility to the public to follow the limits imposed on their powers and not to misuse them for personal purposes.

Sadly, Parksley's officials view their roles differently. They think that they can trade powers amongst themselves in direct violation of their own town's charter and Virginia law. They think that being an elected legislator means that they can unilaterally trespass on people's property, intentionally damage people's possessions without repercussion, and even order people to leave "my town." And they think that their positions mean that they can use the full force of the town's government to punish anyone who dares question their actions.

The evidence and testimony already gathered in this case are overwhelming. They show that the only remaining questions are legal ones. And all the controlling precedent mandates that those legal questions should be resolved in favor of Plaintiffs. Therefore, Plaintiffs' motion for summary judgment should be granted.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### General Background

1.     Parsley, Virginia, is a "little town" where "everybody knows everything." *See* Russell First Dep. 8:20, 16:14, attached hereto as Exhibit "1"; *see also* Lewis First Dep., attached hereto as Exhibit "2"; Layne Dep., attached hereto as Exhibit "3"; J. Welch Dep., attached hereto as Exhibit "4"; Taylor Dep., attached hereto as Exhibit "5"; McCready Dep., attached hereto as Exhibit "6"; F. Welch Dep., attached hereto as Exhibit "7"; Nicholson Dep., attached hereto as Ex. "8"; York Dep., attached hereto as Exhibit "9"; Russell Second Dep., attached hereto as Exhibit "10"; and Lewis Second Dep., attached hereto as Exhibit "11."

2.      Many of the people who live in Parksley and work in Parksley's town government have known each other for their entire lives, grew up together, and attended the same schools. *See, e.g.*, Ex. 8 at 16:23–17:5.

3.      Parksley has experienced changes in recent years, including from an influx of Haitian-Americans. Ex. 8 at 47:12–48:16.

4.      Some of Parksley's residents and town officials may welcome this change, but many do not. When discussing this specific change in Parksley during his deposition, Defendant Nicholson even went so far as to say: "Nobody wants change." *See id.* at 48:15.

5.      Plaintiffs Theslet Benoir and Clemene Bastien are Haitian-Americans and are husband and wife. They are also United States citizens, and they reside in Parksley. Benoir Decl. ¶¶ 2–3; Bastien Decl. ¶¶ 2–3.

6.      Plaintiffs Benoir and Bastien own a store in Parksley named the Eben-Ezer Variety Market. *Id.* at ¶ 3.

7.      In May 2023, Plaintiffs obtained an annual business license from Parksley for their food truck, Plaintiff Eben-Ezer Haitian Food Truck LLC. Answer ¶ 22.

8.      This was the first time that the town had ever issued an annual business license to a food truck. Answer ¶ 19.

9.      Plaintiffs operated the food truck while parked next to their store and on the same property as their store. Benoir Decl. ¶ 13; Bastien Decl. ¶ 13; Answer ¶ 27.

10.     Plaintiffs obtained the property on which their store and food truck are located through a rent-to-own agreement. Benoir Decl. ¶ 6; Bastien Decl. ¶ 6.

11.     Plaintiffs' food truck business is a valid Virginia limited liability company. *Id.* at ¶ 4; Answer ¶ 11.

12.     Plaintiffs possess all the necessary licenses and meet all applicable requirements to operate a food truck in the Commonwealth of Virginia and in Accomack County. *Id*. at ¶ 8.

13.     Parksley's government has a mayor and a town council. Parksley Town Charter, attached hereto as Exhibit "12."

14.     Parksley's mayor is the head of the executive branch of Parksley's government. *Id*.

15.     Parksley's town council is the head of the legislative branch of Parksley's government. *Id*.

16.     Parksley's mayor neither votes on ordinances (other than as a tie-breaker vote) nor has any legislative powers. *Id*.

17.     Parksley's town council does not have any executive powers. *Id*.

18.     Defendant Nicholson is a member of Parksley's town council. Answer ¶ 13.

19.     Defendant Nicholson has never been a member of the executive branch of Parksley's town government. Ex. 8 at 18:9–16; Answer ¶ 39.

20.     Defendant Nicholson has never been employed by Parksley's town government in any role other than as a councilmember. Ex. 8 at 18:9–16.

21.     Defendant Nicholson has never been a member of law enforcement, any fire department, or any public works department. *Id*.; Answer ¶ 39.

22.     From time to time, Parksley's mayor purports to delegate some of his executive branch responsibilities to specific members of Parsley's town council, and these delegations would be approved by the council. Ex. 8 at 19:17–20.

23.     One of those purported delegations was when the mayor claimed to delegate oversight of Parsley's public works department to Defendant Nicholson. *Id*.

24.     The public never voted on this "delegation" to Nicholson. Ex. 3 at 63:20–24.

25.     In addition to being a Parksley councilmember, Defendant Nicholson owns an appliance business in Parksley. Ex. 8 at 12:13–23.

26.     In addition to being Nicholson's customer, one of Parksley's restaurants is owned by Nicholson's close, lifelong friend. *Id*. at 69:19–70:6.

27.     Multiple Parksley officials, including Defendant Nicholson, stated that they were concerned that Plaintiffs' food truck would hurt the business of Parksley's restaurants. Ex. 5 at 64:9–12.

### The Events of June 16, 2023

28.     On the morning of June 16, 2023, Mayor Russell made a telephone call to Defendant Nicholson and told him that he thought Plaintiffs' food truck was illegally connected to the town's sewer system. Ex. 8 at 137:13–21.

29.     This was not true. Plaintiffs' food truck was connected to an external storage container, not the town's sewer system. *Id.* at 143:11–23, 146:18–22; Stipulation (ECF 35) ¶¶ 16, 17.

30.     Pursuant to an agreement with a "pump-out" company, the external storage container would be emptied by a private company. Benoir Decl. ¶ 19; Bastien Decl. ¶ 19.

31.     Plaintiffs' food truck was parked outside, to the side of Plaintiffs' store. *Id*. at ¶ 20; *see also* photograph Bates numbered DEF000195, attached hereto as Exhibit "13."

32.     The external storage container was located outside behind Plaintiffs' store. Ex. 8 at 43:11–23; Benoir Decl. ¶ 19; Bastien Decl. ¶ 19.

33.     Someone standing directly in front of Plaintiffs' store would not be able to see the external storage container itself. *Id*. at ¶ 33.

34.    However, someone standing to the side of Plaintiffs' store could see the external storage container. *Id*.

35.    The connection to the storage container was through a PVC pipe, which ran from Plaintiffs' food truck to the outside of the near side of Plaintiffs' store, then alongside the outside of the wall, before connecting to the storage container in the backyard. *See* photographs from stipulation (ECF 35), attached hereto as Exhibit "14."

36.    After receiving the mayor's phone call, Nicholson went to Plaintiffs' food truck with an employee of Parksley's public works department. Ex. 8 at 140:6–20.

37.    This was early in the morning before business hours. Benoir Decl. ¶ 25; Bastien Decl. ¶ 25.

38.    Because it was not during business hours, the store and the food truck were both closed. The food truck was not being operated, and no one was in the food truck or in the store. *Id*. at ¶¶ 25–26.

39.    It was obvious that this was a private commercial property. *Id*. at ¶ 24.

40.    Nicholson knew that the property was a private commercial property. *Id*. at ¶ 23.

41.    It was obvious that the food truck was closed at the time. *Id*. at ¶ 26.

42.    It was obvious that the store was closed at the time. *Id*.

43.    It was obvious that no one was there. *Id*.

44.    Nicholson knew that this was not during business hours for the store and the food truck. *Id*. at ¶ 25.

45.    There was nothing exigent about the situation. *Id*. at ¶ 27.

46.    Defendant Nicholson and the employee possessed no warrant nor any other legal permission to trespass on Plaintiffs' property. *Id*. at ¶ 28–30; Answer ¶ 150.

47.     Nicholson and the employee made no effort to determine whether the food truck was connected to Parksley's sewer system. Ex. 8 at 140:1–141:18.

48.     If they had made even a minimal effort to do so, they would have seen or learned that the food truck was not connected to Parksley's sewer system. Benoir Decl. ¶ 31; Bastien Decl. ¶ 31.

49.     If they had waited until either the store or food truck opened, they would have been told and shown that the food truck was not connected to the sewer. *Id.* at ¶ 32.

50.     If they had moved to an angle where they could see the external storage container, then they would have known that the food truck was not connected to the sewer system. *Id.* at ¶ 33.

51.     Instead, Nicholson and the employee went onto Plaintiffs' property and cut the PVC pipe. Specifically, Nicholson ordered the employee to cut the pipe, which he did. Stipulation (ECF 35) ¶ 17.

52.     Nicholson has admitted that he was the person responsible for cutting the pipe. Answer ¶ 36.

53.     Nicholson has admitted that the pipe should not have been cut. Ex. 8 at 143:11–23, 146:18–22.

54.     Nicholson has admitted that he was the person responsible for the wrongful action of cutting the pipe. Answer ¶ 36.

55.     Nicholson has admitted that he knew by the time that the pipe was finished being cut that it should not have been cut. Ex. 8 at 143:11–23.

56.    Nicholson has admitted that he ordered the employee to remove a section from the pipe to make it harder to repair, which the employee did. Ex. 8 at 140:14–141:4; *see also* photograph (ECF 35-6) from stipulation (ECF 35), attached hereto as Exhibit "15."

57.    Nicholson stated at the time that the pipe was cut that his authority as a member of Parksley's town council allowed him to do this. Benoir Decl. ¶ 36; Answer ¶ 147.

58.    Nicholson has admitted that despite knowing that it was wrong to have cut the pipe, he did not fix the pipe. Ex. 8 at 147:1–2.

59.    Plaintiffs eventually fixed the pipe with the help of a third party and resumed operating their food truck, but neither Nicholson nor any other town official assisted them in fixing the pipe. Benoir Decl. ¶¶ 39–40; Bastien Decl. ¶¶ 35–36.

60.    However, the period when they could not operate their food truck because Nicholson had caused the pipe to be cut deprived them of sales and caused their food to spoil, along with other financial damages. Benoir Decl. ¶ 34; Bastien Decl. ¶ 34.

## The Events of June 17, 2023

61.    The very next day, June 17, 2023, Nicholson returned to Plaintiffs' property. Benoir Decl. ¶ 41; Bastien Decl. ¶ 37.

62.    Nicholson was not apologetic. To the contrary, he was enraged. Benoir Decl. ¶¶ 44–45; Bastien Decl. ¶¶ 40–41.

63.    Nicholson saw that a delivery truck driver was attempting to deliver goods to Plaintiffs' store. Benoir Decl. ¶ 41; Bastien Decl. ¶ 37.

64.    Nicholson yelled obscenities at the delivery truck driver and ordered the delivery truck to leave. Nicholson yelled at the delivery truck driver and at Plaintiff Clemene Bastien that

this was "my city" and that he could order anyone to leave based on his authority as a town councilmember. Benoir Decl. ¶¶ 42–49; Bastien Decl. ¶¶ 38–45.

65.     Nicholson yelled at Plaintiff Clemene Bastien to: "Go back to your own country!" Benoir Decl. ¶ 50; Bastien Decl. ¶ 46.

66.     Officers from the Accomack County Sheriff's Office happened to be driving by and saw the disturbance that Defendant Nicholson was causing, so they stopped. Benoir Decl. ¶ 51; Bastien Decl. ¶ 47.

67.     The officers attempted to calm Nicholson down but were unable to do so. Benoir Decl. ¶ 52; Bastien Decl. ¶ 48.

68.     Nicholson told the officers that his authority as a member of Parksley's town council allowed him to do the things he was doing. Benoir Decl. ¶¶ 57–59; Bastien Decl. ¶¶ 53–55.

69.     The officers told Nicholson that he was wrong. Benoir Decl. ¶ 59; Bastien Decl. ¶ 55.

70.     Nicholson told the officers that his authority as a member of Parksley's town council had allowed him to cut the pipe. Benoir Decl. ¶ 57; Bastien Decl. ¶ 53.

71.     The officers told Nicholson that he was wrong. Benoir Decl. ¶ 59; Bastien Decl. ¶ 55.

72.     While this had been going on, the delivery truck driver had moved the delivery truck. Benoir Decl. ¶ 61; Bastien Decl. ¶ 57.

73.     The officers' statements to Nicholson had made him even angrier. He stormed off, got in his vehicle, and parked it right in front of the store, so that the delivery could not be made. Benoir Decl. ¶¶ 60–62; Bastien Decl. ¶¶ 56–58.

74.     The officers ordered Nicholson to move his vehicle so that the delivery could be made. Benoir Decl. ¶ 64; Bastien Decl. ¶ 60.

75.     Nicholson refused and walked away angrily. However, an employee of Parksley's town government moved the vehicle so that the delivery driver could finally make the delivery to Plaintiffs' store. Benoir Decl. ¶¶ 65–66; Bastien Decl. ¶¶ 61–62.

76.     The officers advised Plaintiff Clemene Bastien to obtain a restraining order against Nicholson, which Plaintiffs did. Bastien Decl. ¶ 64.

## Nicholson Was Not the Only Problem

77.     The restraining order expired by its own terms, Bastien Decl. ¶ 65, and the harassment continued. But it was not only Nicholson. Benoir Decl. ¶ 71; Bastien Decl. ¶ 67.

78.     For example, Councilmember Layne explained during his deposition that when someone has a dispute with a town, the town government puts the things that person wants to see happen on the "back burner." Ex. 3 at 47:10–19.

79.     In an attempt to get Plaintiffs in legal trouble so as to shut down their food truck, Councilmember Layne repeatedly contacted the Virginia state government alleging that Plaintiffs were violating state health and environmental laws. Pfeiffer Dep. 16:6–23, 22:4–20, 25:17–21, 28:17–21, 31:16–25, attached hereto as Exhibit "16."

80.     This was an extremely unusual action taken by Councilmember Layne. Defendant Parksley, through its designated representative, testified that it was unaware of any other time in the town's history when a town official had attempted to get a Parksley business owner in trouble with state authorities. Ex. 5 at 21:10–22:3.

81.     Due to Councilmember Layne's persistent complaints, state authorities inspected Plaintiffs' property. However, the state authorities found only the types of minor violations that

they typically find whenever they inspect someone's property, so they allowed Plaintiffs to remedy the issues and took no action against Plaintiffs. Ex. 16 at 49:3–10.

### The Food Truck Ban

82.    Subsequently, the officials who were opposed to Plaintiffs' food truck persuaded the town council that food trucks should be banned. *See* Ordinance 23-01, attached hereto as Exhibit "17."

83.    During the town council's discussions over whether to ban food trucks, several government officials, including councilmembers, stated that food trucks should be banned to protect Parksley's restaurants from competition. See audio recording of September 2023 council meeting, attached hereto as Exhibit "18."

84.    On October 9, 2023, the Parksley town council passed an ordinance banning food trucks (the "Ban"). Ex. 17.

85.    The only exception to the Ban was for special use permits to be issued for special events. *See id*.

86.    Under the Ban, all permanent food trucks were banned. *See id*.

87.    When the town council passed the Ban, the town's mayor, Frank Russell, publicly stated that because the town had sold an annual business license to Plaintiffs for their food truck, the town did not intend to enforce the Ban against Plaintiffs until the annual business license expired. Answer ¶¶ 474, 475.

88.    These statements by Mayor Russell included statements he made to members of the news media, who published the statements. Answer ¶ 475; one of the news articles dated October 19, 2023, is attached hereto as Exhibit "19."

89.    Plaintiffs therefore continued operating their food truck. Benoir Decl. ¶ 75; Bastien Decl. ¶ 71.

90.    Plaintiffs realized that the town's position, as stated by the mayor, meant that Plaintiffs had about seven months to work out a solution with town officials to be able to keep operating once their annual business license eventually expired. Benoir Decl. ¶ 76; Bastien Decl. ¶ 72.

91.    Plaintiffs therefore went about trying to work something out with town officials. Benoir Decl. ¶ 77; Bastien Decl. ¶ 73.

## The Town Government Retaliated Against Plaintiffs

92.    As part of these efforts to work things out with town officials, Plaintiffs spoke with members of the media in the hope that media attention would help convince town officials to work things out with Plaintiffs. *Id.*

93.    In mid-October, Plaintiffs began speaking with members of the news media about their view that the town should repeal the ban or otherwise work something out with them before their annual business license was scheduled to expire in May 2024. *Id.*

94.    This included meeting with members of the media at Plaintiffs' property on October 19, 2023. *Id.*

95.    This resulted in news coverage on October 19, 2023, and subsequent dates, that attracted the attention of town officials. *See* Ex. 10 at 55:25–56:4, 96:12–97:1; Monel Dec. ¶¶ 12–13; email correspondence Bates numbered DEF000394–95 and attached hereto as Exhibit "20."

96.    On October 19, 2023, Town Clerk Lauren Lewis sent an email on behalf of Mayor Russell to new Town Attorney Wiggins. Ex. 20.

97.     The town's previous attorney, Tom Dix, retired shortly before the town council passed the Ban. Ex. 3 at 59:2–3.

98.     The town hired Andre Wiggins to be the new town attorney, and Attorney Wiggins began working for the town during October 2023, but after the Ban was passed. Ex. 10 at 27:4–14.

99.     It was common practice for Clerk Lewis to send and receive emails on behalf of Mayor Russell. *Id.* at 11:19–12:8, 30:17–25.

100.     Mayor Russell did not like to use email, so when email was appropriate, he preferred to speak with Clerk Lewis, who would send and receive the emails on his behalf. *See id.*

101.     The October 19, 2023, email from Clerk Lewis to Attorney Wiggins was the first email she sent on behalf of Mayor Russell to Attorney Wiggins about any subject. Ex. 10 at 11:15–18, 23:24–24:5; Ex. 11 at 9:22–10:13; Ex. 20.

102.     The October 19, 2023, email from Clerk Lewis to Attorney Wiggins was the first time that Mayor Russell ever communicated with Attorney Wiggins about food trucks at all. *See id.*

103.     The October 19, 2023, email from Clerk Lewis to Attorney Wiggins stated that Clerk Lewis "just received a phone call from the Mayor (whose auto repair shop is next door to the [Plaintiffs'] market and truck) informing me that they have a TV crew out there currently. Great times." Ex. 20 (parentheses in original).

104.     The October 19, 2023, email from Clerk Lewis to Attorney Wiggins attached a copy of the Ban. *Id.*

105.    The October 19, 2023, email from Clerk Lewis to Attorney Wiggins was the first time that the Ban was sent to Attorney Wiggins or discussed with Attorney Wiggins. *Id*.

106.    The October 19, 2023, email from Clerk Lewis to Attorney Wiggins stated that they "need a letter to send [Plaintiffs] informing them of the [Ban] and notifying them that they have to comply and cannot continue to operate as they have been." *Id*.

107.    Mayor Russell conceded during his deposition that he could not remember anything else that happened during the ten days between his public statements on October 9, 2023, and the October 19, 2023, email to change his position on enforcing the Ban against Plaintiffs. Ex. 10 at 59:20–60:6.

108.    During his depositions, Mayor Russell repeatedly voiced his anger at the resulting media coverage, which he claimed had "upset my entire little town here." *Id*. at 44:8–9.

109.    Mayor Russell also testified that he blamed Plaintiffs' counsel's law firm, the non-profit Institute for Justice, for helping Plaintiffs to obtain the media attention that was unfavorable to the town. *See id*. at 94:18–95:9.

110.    In Mayor Russell's view, the media attention that the Institute for Justice helped Plaintiffs to obtain was like an "atom bomb," *see id*. at 56:4, that cost Parksley its reputation, *id*. at 96:21.

111.    As a result of his anger, Mayor Russell was not able to hide the fact that the media attention was what caused him to change his mind about enforcing the Ban against Plaintiffs. As he explained during his deposition:

> Because that's what you guys promoted, that's what you generated.
>
> You took this little simple thing and blew it up into a gigantic story that was all over the internet, all over the newspapers, and you guys did it. You sent it out. You cc'ed it to everybody. You are the ones that promoted this.

13

> If you hadn't got involved in this, we – – we would have worked out something with these poor people and they would be selling hotdogs[1] right now.

*Id*. at 98:10–20.

112.    Plaintiffs did not know at that time that the media attention was having the opposite of Plaintiffs' desired effect on town officials, so Plaintiffs continued to speak with the media. Benoir Decl. ¶ 78; Bastien Decl. ¶ 74.

113.    Each time this happened, town councilmembers would email each other complaining about the media coverage. Some of these same emails would also ask when Attorney Wiggins was going to send the letter ordering Plaintiffs to stop operating their food truck. *See* email Bates numbered DEF000044, attached hereto as Exhibit "21"; email Bates numbered DEF000046, attached hereto as Exhibit "22"; email Bates numbered DEF000047, attached hereto as Exhibit "23."

114.    While Attorney Wiggins was drafting the letter, he realized that the town's zoning code had a catch-all provision saying that anything not expressly authorized by the code was prohibited. Since food trucks were not expressly authorized by the zoning code, this meant that they were prohibited by this pre-existing catch-all provision. *Se*e email Bates numbered DEF000404–05, attached hereto as Exhibit "24"; email Bates numbered DEF000418, attached hereto as Exhibit "25"; emails Bates numbered DEF000422–27, attached hereto as Exhibit "26"; email Bates numbered DEF000432–33, attached hereto as Exhibit "27."

115.    These types of catch-all provisions are easier to defend against constitutional challenges than the type of food truck ban that the town had passed. *See* Ex. 24–27.

---

[1] Mayor Russell is well aware that Plaintiffs' food truck sold Haitian food, not hot dogs, but the way Mayor Russell phrased his statement is illustrative of the insulting attitude of Parksley's town officials towards Plaintiffs.

116.    The first time Attorney Wiggins realized that the zoning code's catch-all provision implicitly banned food trucks was in the last few days of October 2023, long after the October 19, 2023, email instructing him to prepare the cease-and-desist letter. Ex. 10 at 19:7–12, 65:20–66:14.

117.    On the morning of November 2, 2023, Plaintiffs' counsel emailed a letter to Defendants asserting that the Ban was unconstitutional. See letter from Institute for Justice, attached hereto as Exhibit "28"; email sending letter from Institute for Justice, attached hereto as Exhibit "29."

118.    Later that same day, in response to Plaintiffs' counsel's letter, Attorney Wiggins informed the town council, through Clerk Lewis, that the Ban "is unconstitutional and violates VA state law. He's not even sure he is able to make it legal." See email Bates numbered DEF000456, attached hereto as Exhibit "30."

119.    Attorney Wiggins sent the cease-and-desist letter to Plaintiffs in an envelope postmarked November 3, 2023. The cease-and-desist letter was dated November 1, 2023. Letter and envelope from Town Attorney Wiggins, attached hereto as Exhibit "31."

120.    On November 3, 2023, Attorney Wiggins emailed Defendants, through Clerk Lewis, warning them to "be prepared for the assertion" that the positions being taken in the cease-and-desist letter were being made "out of spite." *See* email Bates numbered DEF000460, attached hereto as Exhibit "32."

121.    Plaintiffs received Attorney Wiggins's cease-and-desist letter on November 6, 2023. The letter's threats of possible imprisonment and fines terrified Plaintiffs and caused them to stop operating their food truck. Benoir Decl. ¶¶ 80, 88, 92; Bastien Decl. ¶¶ 76, 84, 88.

122.    On November 9, 2023, the town council repealed the Ban and took the position that the express Ban had been unnecessary because food trucks were already banned by the zoning code's catch-all provision. *See* Ex. 10 at 89:5–11.

123.    Plaintiffs continued to try to work things out with town officials. Monel Dec. ¶¶ 9–17.

124.    As part of those efforts, Reverend Calherbe Monel, who was attempting to assist Plaintiffs, met with Mayor Russell, Clerk Lewis, Defendant Nicholson, and other Parksley officials in November 2023. Monel Dec. ¶¶ 9–17.

125.    At the meeting, the town officials made Reverend Monel turn off his telephone and put it in a different room from where the meeting took place. *Id*. at ¶ 11.

126.    The town officials told Reverend Monel that he needed to do this to ensure that what they said would not be recorded and given to news reporters or other members of the media. Reverend Monel complied. *Id*.

127.    During the meeting, Mayor Russell talked at length about how angry he was at Theslet Benoir and Clemene Bastien for the media attention that depicted Parksley's government in a negative light. *Id*. at ¶ 12.

128.    Mayor Russell said that Parksley's government had always been nice to Theslet and Clemene, so he viewed their talking to the media as a betrayal. *Id*. at ¶ 13.

129.    During the meeting, Reverend Monel talked with the town officials about whether Theslet and Clemene could apply for a special use permit for their food truck. Mayor Russell and the other town officials said that although "permanent" food trucks were now banned, special use permits could still be allowed. *Id*. at ¶ 14.

16

130.    However, Mayor Russell and the other town officials said that before Theslet and Clemene could even apply for a special use permit for their food truck, they would first need to obtain written permission from every property owner whose property line was within 500 feet. *Id*. at ¶ 15.

131.    Mayor Russell and the other town officials pointed out that this would require Theslet and Clemene to obtain written permission from multiple individuals who were outspoken opponents of the food truck, including but not limited to Councilmember Henry Nicholson. *Id*. at ¶ 16.

132.    The point that Mayor Russell and the other town officials were making was that it would be impossible for Theslet and Clemene to ever do what was required to even be able to apply for a special use permit for their food truck. *Id*. at ¶ 17.

133.    On January 23, 2024, Plaintiffs filed this lawsuit (which was subsequently amended on April 16, 2025). *See* Pls.' Compl.; Pls.' Am. Compl.

### STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Gowen v. Winfield*, 130 F.4th 162, 171–72 (4th Cir. 2025) (quoting, in part, Fed. R. Civ. P. 56(a)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat . . . summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). Thus, summary judgment may only be avoided "if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020).

## ARGUMENT

Summary judgment should be granted in favor of Plaintiffs on all claims argued here.[2] These claims fall into three categories: 1) claims against Defendant Nicholson in his personal capacity for cutting Plaintiffs' pipe; 2) claims against Defendant Parksley and Defendant Nicholson in his official capacity for cutting Plaintiffs' pipe; and 3) a claim against Defendant Parksley for retaliating against Plaintiffs.

**I.    <u>Summary Judgment Should Be Entered Against Defendant Nicholson in his Personal Capacity for Cutting Plaintiffs' Pipe.</u>**

It is undisputed that Defendant Nicholson was responsible for cutting Plaintiffs' pipe on June 16, 2023, and that it was wrong to do so. Answer ¶ 36; Ex. 8 at 143:11–23. This leaves two questions of law: 1) whether Nicholson's wrongful actions violated either the U.S. Constitution or Virginia law; and 2) if so, whether Nicholson is personally liable. The answer to both is yes.

*A.    <u>Defendant Nicholson violated both the U.S. Constitution and Virginia law.</u>*

Nicholson's admittedly wrongful actions causing Plaintiffs' pipe to be cut while acting under color of law violated the U.S. Constitution's Fourth and Fourteenth Amendments, as well as Virginia law.

First, as alleged in Count I of Plaintiffs' Amended Complaint, Nicholson's actions violated Plaintiffs' Fourth Amendment rights, as incorporated against the states (and their local governments) through the Fourteenth Amendment. *See Torres v. Madrid,* 592 U.S. 306, 318–24 (2021) (application of physical force with the "intentional acquisition of physical control" constitutes a seizure for Fourth Amendment purposes (citation omitted)).

---

[2] Plaintiffs seek summary judgment on all of their claims except for Counts III and IV, which are equal protection claims, *see* Am. Compl. Counts III, IV, which Plaintiffs believe are not amenable to summary judgment.

Nicholson seized Plaintiffs' pipe by taking control of it, intentionally causing it to be severed through the application of physical force, and intentionally causing a section of the pipe to be removed. The fact that he wrongfully caused these things to happen is undisputed. Therefore, Nicholson violated the Fourth Amendment.

Although bad enough, that is not even the full extent of Nicholson's Fourth Amendment violations. Nicholson did this while trespassing on property that he knew to be private, before business hours, when Plaintiffs were not present, and while nothing was going on. He also did it without a warrant, even though the situation was not exigent.

Nicholson's actions also violated Virginia law, as alleged in Count V of Plaintiffs' Amended Complaint. Under Virginia law, Nicholson's actions constituted a trespass to chattels. *See Vines v. Branch*, 244 Va. 185, 190, 418 S.E.2d 890, 893–94 (1992). Again, Nicholson has already admitted that he wrongfully deprived Plaintiffs of the use of the pipe, so he is therefore "liable to its rightful possessor for actual damages suffered for loss of its use." *See id*.

Before turning to Defendants' qualified immunity defense, it should be noted that even if qualified immunity were to apply, Plaintiffs would still be entitled to declaratory relief. *See S.C. State Bd. of Dentistry v. FTC*, 455 F.3d 436, 447 (4th Cir. 2006) (holding that qualified immunity "has no application to suits for declaratory or injunctive relief"). But as shown next, Nicholson should also be found liable for compensatory damages.

B. *Defendant Nicholson is personally liable.*

Defendant Nicholson is personally liable. No federal immunity applies to his Fourth and Fourteenth Amendment violations, and no state immunity applies to his violations of state law.

i.      **Federal Qualified Immunity Does Not Apply Here.**

Qualified immunity does not protect Nicholson from financial liability for his Fourth and Fourteenth Amendment violations for three independent reasons. First, Nicholson's actions were outside the scope of his authority. Second, Nicholson's actions violated established precedent. Third, Nicholson's actions were obviously unconstitutional.

This is particularly true because the qualified immunity test is an objective, not a subjective, one. *See Davison v. Rose*, 19 F.4th 626, 630 (4th Cir. 2021). An official's "subjective intent or beliefs play no role" in determining immunity; instead, courts in the Fourth Circuit evaluate whether the official's conduct was objectively reasonable. *Brown ex rel. Lawhorn v. Elliott*, 876 F.3d 637, 644 (4th Cir. 2017) (citation omitted).

a.  *Nicholson's acts were outside the scope of his authority.*

To claim qualified immunity once a violation has been established, the official bears the entire burden to prove that their conduct falls within the scope of their official duties. *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997). This is because a government official "who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity." *Id*. at 593. Nicholson cannot meet his burden here.

Nicholson's acts clearly exceeded the scope of his authority. Nicholson's only office with the Town of Parksley has ever been as a town councilmember. Ex. 8 at 14:25–15:11, 18:12–16. Despite being solely a legislator, Nicholson unlawfully entered Plaintiffs' property with neither permission nor a warrant and while no one was there. And then Nicholson caused the pipe to be cut.

The Parksley council on which Nicholson sits is the town's legislative body. Ex. 8 at 20:23–21:5. Its members exercise legislative authority, which includes things like writing or

voting on legislation. *See Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998). Local legislators have discretionary authority to set public policy for the town, like deciding what services the town provides. *Id.* at 55–56. And local legislators only engage in legislative acts when their acts involve "adopting prospective, legislative-type rules"—in other words, lawmaking. *Alexander v. Holden*, 66 F.3d 62, 67 (4th Cir. 1995). None of these descriptions apply to Nicholson's conduct in this case. Nicholson claims that he believed that Plaintiffs were violating an existing law—and then personally searched and damaged their property to remedy that perceived (and non-existent) violation.

Lawmaking is not law enforcement. Conducting searches and enforcing existing law are executive acts—not acts within Nicholson's job description. *See Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979) (conducting searches is for law enforcement). A reasonable legislator in Nicholson's position would have known the difference.

Courts look to statutes or regulations controlling an official's duties to determine the scope of their authority. *In re Allen*, 106 F.3d at 595. Here, they all point in one direction. Towns are creatures of the state, and the Virginia Constitution separates the legislative and executive powers of the state into distinct departments while mandating that no person shall wield both powers simultaneously. Va. Const. art. III, § 1. Consistent with this approach, the Code of Virginia lays out the powers and responsibilities of municipal officials in painstaking detail. *See* Va. Code Ann. §§ 15.2-1400 *et seq.* This includes an express prohibition on any mayor or council member holding more than one of the listed offices at a time. *See* Va. Code Ann. § 15.2-1534. Along these same lines, the Parksley town charter vests executive authority in the mayor alone as "the chief executive and administrative officer of the town." Ex. 12.

21

Yet, Mayor Russell claimed to delegate oversight of the Public Works Department to Nicholson. *See* December 12, 2022, Parksley City Council Minutes, attached hereto as Exhibit "33." To quote a famous advertisement, "that's not how any of this works."[3] Neither Virginia law nor the town charter allows the mayor or town council to turn councilmembers into law-enforcement officials. *See* Va. Code Ann. § 15.2-1534; Ex. 12 at 2. Clerk Lewis acknowledged as much when she expressly testified that the council would need to amend the Parksley charter before they could lawfully place Nicholson in charge of Public Works. Ex. 2 at 20:4–9, 105:18–106:1. That amendment never happened, nor would it even be permissible under state law.

No reasonable legislator would believe that their legislative office vests them with the authority to personally investigate and punish legal violations. Nor would a reasonable legislator believe that a purported delegation of executive branch powers to them in direct violation of their town's charter and state law was valid. Therefore, Nicholson's actions were outside the scope of his authority, and qualified immunity does not apply. *See In re Allen*, 106 F.3d at 594.

> b. *Nicholson violated clearly established precedent.*

An independent reason qualified immunity does not apply is that Nicholson violated a clearly established right. *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018). "In our Circuit, Defendants bear the burden of proving that the unlawfulness of their conduct was not clearly established." *Garrett v. Clarke*, 74 F.4th 579, 583 (4th Cir. 2023) (citing *Stanton v. Elliott*, 25 F.4th 227, 233 n.5 (4th Cir. 2022)). Moreover, the United States Supreme Court has clearly established that warrantless searches of private property are *per se* violations of the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 357 (1967). Nicholson did not have a warrant to enter Plaintiffs' property or destroy their sewage connection. Answer ¶¶ 150–52. Nicholson is

---

[3] *See* Esurance Advertisement, *available at* https://www.youtube.com/watch?v=Aq_1l316ow8.

not even a law-enforcement officer. *Id.* ¶¶ 39, 151. And, as Nicholson concedes, no exception to the warrant requirement applies in this case. *Id.* ¶ 152.

Every reasonable official knows that the Fourth Amendment prohibits searching someone's land for a potential legal violation without a warrant in a non-exigent circumstance and destroying their property in the process. Indeed, by 2023, it was clearly established that warrantless searches, absent few inapplicable exceptions, violate the Fourth Amendment. *See Torres*, 592 U.S. at 318; *Katz*, 389 U.S. at 347. It was also clearly established that warrantless seizures of property, absent few inapplicable exceptions, also violate the Fourth Amendment. *See Horton v. California*, 496 U.S. 128 (1990). And it was similarly clearly established that damaging property without judicial process violates the Fourth Amendment. *See Soldal v. Cook County*, 506 U.S. 56 (1992). Yet, Nicholson committed these constitutional violations anyway.

### c.   *Nicholson's violations were obvious.*

Yet another independent reason qualified immunity does not apply is that the U.S. Supreme Court and the Fourth Circuit have explained that qualified immunity does not protect obvious violations. *See Taylor v. Riojas*, 592 U.S. 7 (2020); *Rambert v. City of Greenville*, 107 F.4th 388 (4th Cir. 2024). In the Fourth Circuit's words: "some misconduct is so flagrant that the plaintiff need not point to a case precisely on point to demonstrate that an officer was on notice that their conduct violated the law." *Rambert*, 107 F.4th at 402 n.3.

Such is the case here. A local legislator trespassed on private property without a warrant and then unilaterally decided to cut Plaintiffs' pipe without any type of due process, supposedly to remedy a problem that did not actually exist, a fact which could have been learned through a mere modicum of effort. To say that this violation should have been obvious to an objectively reasonable local official would be an understatement. Consequently, even if this Court were to

hold that Defendant Nicholson's actions were within the scope of his authority and there was no clearly established precedent on point, Defendant Nicholson would still be personally financially liable regardless.

### ii.    Virginia's State Law Immunities Do Not Apply Here Either.

Defendant Nicholson is not protected by any immunities against Plaintiffs' state law claim either. Virginia's qualified immunity protection is much narrower than its federal counterpart and only applies to rare situations involving false arrests when the officers had probable cause. *See DeChene v. Smallwood*, 226 Va. 475, 479, 311 S.E.2d 749, 751 (1984). In fact, the doctrine is so different from, and narrower than, federal qualified immunity that Virginia courts did not even start using that term to describe it until later. *See Jordan v. Shands*, 255 Va. 492, 500 S.E.2d 215 (1998). Regardless, it has no application here.[4]

Perhaps relatedly, Virginia's version of sovereign immunity can sometimes protect individual officials in ways that its federal analogue does not. *See Cromartie v. Billings*, 298 Va. 284, 297, 837 S.E.2d 247, 254 (2020). However, Virginia's version of sovereign immunity only protects officials against claims of simple negligence and can never be used against claims of gross negligence, willful misconduct, or intentional torts. *See id.*; *see also Messina v. Burden*, 228 Va. 301, 321 S.E.2d 657 (1984).

Here, the acts to which Nicholson has admitted responsibility are intentional. He did not trip and stumble onto Plaintiffs' property and, in doing so, accidentally damage their PVC pipe. Quite the contrary—Nicholson willfully and intentionally went onto their property and then

---

[4] It is also worth noting that federal qualified immunity cannot protect state and local official against state law claims. *See Hupp v. Cook*, 931 F.3d 307, 326 (4th Cir. 2019).

willfully and intentionally caused force to be applied to their pipe, thereby severing it. As a result, no Virginia state law immunity applies.

## II.    Summary Judgment Should Be Entered Against Defendant Parksley and Defendant Nicholson in his Official Capacity for Cutting Plaintiffs' Pipe.

Defendant Nicholson, as an individual, is not the only one who should be ordered to pay compensatory damages for his Fourth and Fourteenth Amendment violations *See supra*.[5] So too should Defendant Parksley and Nicholson in his official capacity.

The reason is *Monell*. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). There, the U.S. Supreme Court held that municipalities were not liable for the acts of their employees under a mere respondeat superior theory. *Id*. at 692. Instead, the Court has listed specific situations when a municipality is financially liable. Two of these independent bases are particularly relevant here: 1) when the harm resulted from the actions of a "policymaker"; or 2) when the harm resulted from a municipality's "policy or custom." *See Spell v. McDaniel*, 824 F.2d 1380, 1385–91 (4th Cir. 1987).

First, when the mayor delegated (with the council's approval) oversight of the Public Works Department to Nicholson (albeit in violation of the town charter and Virginia law), Nicholson became the relevant "policymaker" for the purposes of Nicholson's decision that Plaintiffs' pipe should be cut. As far as Nicholson, the other councilmembers, and the mayor were (wrongly) concerned, Nicholson did not need approval from anyone else in the town government before he could make the decision to cut Plaintiffs' pipe.

---

[5] Again, it should be noted that even if, arguendo, the Court were to disagree as to *Monell*, this would not change the fact that declaratory relief should be entered against Parksley and Nicholson in his official capacity. *See S.C. State Bd. of Dentistry*, 455 F.3d at 447.

Second, Mayor Russell's unlawful practice of "delegating" executive powers to local legislators was Parksley's policy and custom. *See* Ex. 3 at 11:11–17. These "delegations" were done formally, through official written documents that, despite violating the town's charter and Virginia law, were voted on and purportedly approved by the town council. *See* Ex. 33. This is more than sufficient to be viewed as Defendant Parksley's policy. *See Spell*, 824 F.2d at 1387 (explaining that a "policy" for *Monell* purposes includes any "consciously adopted courses of government action").

Moreover, although that would have been enough for these purposes, it should also be noted that this approach was not unusual in Parksley. To the contrary, Mayor Russell would issue these "delegations" to specific councilmembers from time to time, whenever Mayor Russell felt like it. *See* Ex. 3 at 11:11–17. Therefore, in addition to being the town's policy, they were also its custom.

### III.    Summary Judgment Should Be Entered Against Defendant Parksley for Retaliating Against Plaintiffs.

Finally, summary judgment should be granted in favor of Plaintiffs on Count VI of Plaintiffs' Amended Complaint, which asserts that Parksley's town government retaliated against Plaintiffs. As with the Counts mentioned above, the evidence here is overwhelming.

### A.    *Parksley Retaliated Against Plaintiffs for Their Speech.*

The undisputed facts remove any reasonable doubt as to what was going on. It is undisputed that Mayor Russell publicly announced on October 9, 2023, that Parksley did not intend to enforce the food truck Ban against Plaintiffs until their annual business license's expiration in May 2024. Answer ¶ 98. It is undisputed that, ten days later, when Plaintiffs began speaking with the media on October 19, 2023, the Mayor changed his mind and instructed Attorney Wiggins to begin drafting a cease-and-desist letter. Ex. 20. It is undisputed that this was

the first time that Attorney Wiggins was informed of the Ban, and that this was the first time that Mayor Russell had communicated with Attorney Wiggins regarding food trucks at all. Ex. 10 at 11:15–17, 23:24–24:5; Ex. 11 at 9:22–10:13. It is undisputed that the media attention infuriated Mayor Russell. Monel Dec. ¶¶ 12–13. And it is undisputed that nothing happened during those ten days, other than Plaintiffs talking with the reporters and the resulting media attention, which would have caused Mayor Russell to change his mind. Ex. 10 at 59:20–60:6.

This undisputed chronology already would have been sufficient for summary judgment, but Mayor Russell then proceeded to remove any doubt during his depositions. Mayor Russell testified at length about his anger at what he viewed as unfair media attention that Plaintiffs' counsel's non-profit firm helped Plaintiffs to generate. This included Mayor Russell's testimony that this media coverage was like an "atomic bomb" that ruined the town's reputation. *Id*. at 56:4, 96:21. And Mayor Russell testified that if this had not happened, Plaintiffs would still be operating their food truck today. *Id*. at 98:10–20.

Therefore, Parksley has unconstitutionally retaliated against Plaintiffs. "The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (*quoting Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)). To prevail, plaintiffs must show that: 1) their speech was protected; 2) Defendant Parksley's retaliatory actions adversely affected Plaintiffs' constitutionally protected speech; and 3) a causal relationship exists between Plaintiffs' speech and Defendant Parksley's retaliatory actions. *See Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013). Plaintiffs have proven all three elements.

First, it cannot be reasonably disputed that Plaintiffs' speech as protected. *See* U.S. Const. amend I (protecting both freedom of speech and of the press).

Second, Defendant Parksley's retaliatory actions affected Plaintiffs' constitutionally protected speech. This is more than covered by Plaintiffs' testimony that their speech was chilled. Benoir Decl. ¶ 95; Bastien Decl. ¶ 91. However, it is also worth noting that even if Plaintiffs' speech had not been chilled, Defendant Parksley would still be liable. This is because the Fourth Circuit has explained that the actual chilling of speech is not required. Instead, if Defendant Parksley's "retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights," then Defendant Parksley is liable for that conduct. *See Constantine*, 411 F.3d at 500.

This standard has been more than met here. Plaintiffs are business owners who would have been allowed to keep operating their food truck business for at least another seven months. But because of their speech, they were forced to immediately close it. This is the type of conduct that would obviously deter any business owner of ordinary firmness.

Third, a causal connection existed between Plaintiffs' speech and Defendant Parksley's retaliatory conduct. On October 9, 2023, Mayor Russell announced that he did not intend to enforce the Ban against Plaintiffs until their business license expired. After ten days passed during which no relevant things happened, Plaintiffs spoke to the media on October 19, 2023, at which point Mayor Russell suddenly changed his mind. And then Mayor Russell testified that but for the media attention, Plaintiffs would still be operating their food truck today.

This means that declaratory and injunctive relief should be entered against Defendant Parksley, and the only remaining question is whether damages should also be entered.

B. _Defendant Parksley is Liable for Retaliation Under_ Monell.

Finally, the analysis turns back to _Monell_. _See supra_. Again, the precedent holds that Parksley is financially liable for two independent reasons: 1) the harm was caused by a policymaker; and 2) the harm was caused by Parksley's policy or customs.

First, this decision was made by a policymaker. Mayor Russell is the head of Parksley's executive branch. Like any head of an executive branch of government, he has enforcement discretion and is therefore the "policymaker" for _Monell_ purposes on these types of issues. _See St. Maron Props., L.L.C. v. City of Houston_, 78 F.4th 754, 761 (5th Cir. 2023) (holding that mayor is policymaker for _Monell_ liability); _Valentino v. Vill. of S. Chi. Heights_, 575 F.3d 664, 674–78 (7th Cir. 2009) (same); _Hill v. Borough of Kutztown_, 455 F.3d 225, 245–46 (3d Cir. 2006) (same).

Additionally, it should be noted that Parksley's town council was copied on the communications between Mayor Russell and Attorney Wiggins, and that the town council approved of Mayor Russell's change of mind. Indeed, some of the council members were also clearly bothered by the media attention, leading them to ask when Attorney Wiggins was going to send the cease-and-desist letter. Exs. 21–27. Therefore, even if Defendants were to try to argue that the mayor was not the policymaker, it would not matter, as every plausible policymaker consented to this action. Put differently, when something is an official act of the relevant government body, it is automatically official policy.

Second, this violation occurred as a result of Parksley's official policy. As mentioned above, _see supra_, a "policy" for _Monell_ purposes includes all "consciously adopted courses of government actions." _Spell_, 824 F.2d at 1387. The cease-and-desist letter was sent on official letterhead by the town attorney at the express direction of the town's mayor and with the express

consent of the town council. No town official has ever claimed that Attorney Wiggins was acting outside of the directions given to him, nor could they claim this considering the paper trail created by the emails. This is far more than enough to evidence a policy for *Monell* purposes.

Therefore, Defendant Parksley is financially responsible for the harm its retaliation caused to Plaintiffs.

## CONCLUSION

For the aforementioned reasons, the Court should grant summary judgment in favor of Plaintiffs on Counts I, II, V, and VI of Plaintiffs' Amended Complaint.


DATED this 21st day of April, 2025.

Respectfully submitted,

/s/ Paul M. Sherman                          /s/ Justin Pearson
Paul M. Sherman (VA Bar No. 73410)           Justin Pearson* (FL Bar No. 597791)
Dylan Moore* (ME Bar No. 010327)             Institute for Justice
Matthew Liles* (DC Bar No. 90027919)         2 South Biscayne Blvd., Suite 3180
Institute for Justice                        Miami, FL 33131
901 North Glebe Rd., Suite 900               Tel: (305) 721-1600
Arlington, VA 22203                          Fax: (305) 721-1601
Tel: (703) 682-9320                          Email: jpearson@ij.org
Fax: (703) 682-9321
Email: psherman@ij.org
dmoore@ij.org
mliles@ij.org

*Attorneys for Plaintiffs*
*Admitted *pro hac vice*