UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

|  |  |
|---|---|
| THESLET BENOIR and CLEMENE BASTIEN, *a married couple*, and EBEN-EZER HAITIAN FOOD TRUCK LLC, <br><br> Plaintiffs, <br><br> v. <br><br> TOWN OF PARKSLEY, VIRGINIA and HENRY NICHOLSON, *in his official and individual capacities*, <br><br> Defendants. | Civil No. 2:24cv64 |

## <u>ORDER</u>

Pending before the Court are a Motion for Summary Judgment (the "Parksley Motion") (ECF No. 56) and a Memorandum in Support thereof (ECF No. 57) filed by Defendants Town of Parksley, Virginia ("Parksley") and Henry Nicholson ("Mr. Nicholson") (together, "Defendants") and a Partial Motion for Summary Judgment (the "Benoir Motion") (ECF No. 58) and a Memorandum in Support thereof (ECF No. 59) filed by Plaintiffs Theslet Benoir ("Mr. Benoir"), Clemene Bastien ("Ms. Bastien"), and Eben-Ezer Haitian Food Truck LLC ("EEHFT") (together, "Plaintiffs"). For the following reasons, the Parksley Motion (ECF No. 56) is **GRANTED in part** and **DENIED in part** and the Benoir Motion (ECF No. 58) is **GRANTED in part** and **DENIED in part**.[1]

---

[1] The Court has determined that a hearing on the Parksley Motion and the Benoir Motion is unnecessary, as the issues for decision are adequately presented in the

1

## I.    FACTUAL BACKGROUND

When adjudicating cross-motions for summary judgment, a court must "review each motion separately and resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing the motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 623 (4th Cir. 2003) (citation modified).

### A.    Undisputed Material Facts

#### 1.    *Running the Town of Parksley*

Parksley is a small town located in Virginia's Eastern Shore, and a municipal corporation chartered by the Commonwealth of Virginia. Am. Compl. ¶¶ 18–19, ECF No. 54 ("Am. Compl."); Def. Mem. Supp. Ex. 1 § 2.1, ECF No. 57-1 ("Parksley Charter")). Parksley is governed by a mayor and 6 town council members. Parksley Charter § 3.1. At all times relevant herein, the Parksley Mayor was Frank Russell ("Mayor Russell"), and the 6 town council members were Mr. Nicholson, Bradley York ("Mr. York"), Richard Taylor ("Mr. Taylor"), Mark Layne ("Mr. Layne"), Francis Welch ("Mr. Welch"), and Janice Welch ("Ms. Welch") (collectively, the "Parksley Town Council"). Def. Mem. Supp. at 3–4, ECF No. 57 ("Def. Mem. Supp."). Parksley's Mayor is the head of the executive branch of Parksley's government. Parksley Charter § 3.4. The Mayor presides over the meetings of the Parksley Town Council and has the right to speak at such meetings, but does not vote except in the case of a tie vote. *Id.*

---

briefs. *See* E.D. Va. Local Civ. R. 7(J). Plaintiffs' Request for Oral Argument (ECF No. 60) is therefore **DENIED**.

The Parksley Town Council meets at most twice a month, including for work sessions. Def. Mem. Supp. Ex. 2 at 72:17–72:21, ECF No. 57-2 ("Nicholson Dep.").[2] Each Parksley Town Council member—except for Mr. York, who is retired—holds another job unrelated to being a member of the council, and none have legal backgrounds. Def. Mem. Supp. Ex. 3 at 7:19–25, ECF No. 57-3; Def. Mem. Supp. Ex. 4 at 58:08–14, ECF No. 57-4 ("Taylor Dep."); Def. Mem. Supp. Ex. 5 at 20:15–18, ECF No. 57-5 ("Russell Dep.").

Mr. Nicholson was officially appointed Supervisor of Parksley Public Works by Mayor Russell pursuant to a March 13, 2023 resolution passed by the Parksley Town Council, and with the consent of the Parksley Town Council, and remained in that position at all times relevant to this action. Def. Mem. Supp. Ex. 8, ECF No. 57-8; Def. Mem. Supp Ex. 9 at DEF000253, ECF No. 57-9; Nicholson Dep. at 18:06–08.[3]

---

[2] This Order uses the original pagination of the documents.

[3] Plaintiffs contend that Mr. Nicholson was invalidly appointed as Supervisor of Parksley Public Works. *See* Pl. Mem. Supp. at 21–22, ECF No. 59. Plaintiffs cite Va. Code Ann. § 15.2-1534 for the assertion that there is "an express prohibition on any mayor or council member holding more than one of the listed offices at a time." *Id.* at 21. That statute provides that "no person holding the office of treasurer, sheriff, attorney for the Commonwealth, clerk of the circuit court, commissioner of the revenue, supervisor, councilman, mayor, board chairman, or other member of the governing body of any locality shall hold more than one such office at the same time." Va. Code Ann. § 15.2-1534.

The Court is not persuaded that "Supervisor of Public Works" would be considered "a member of the governing body" of Parksley. Therefore, the Court does not interpret Va. Code Ann. § 15.2-1534 to indicate that Mr. Nicholson was barred from simultaneously holding the offices of Parksley Town Council member and Supervisor of Public Works. And, "[i]n the absence of evidence to the contrary, there is a *prima facie* presumption that [a town] charter or an amendment thereof was enacted in the manner required by the [Virginia] Constitution[.]" *Fauber v. Town of Cape Charles*, 896 S.E.2d 818, 823 (Va. Ct. App. 2024).

Parksley Public Works and Mr. Nicholson, as its Supervisor, were, at all times relevant, in charge of both Parksley's water and sewer systems. Nicholson Dep. at 213:11–16; Def. Mem. Supp. Ex. 7 at 13:14–17, ECF No. 57-7. As Supervisor of Parksley Public Works, Mr. Nicholson directed its employees in their daily tasks. Nicholson Dep. at 25:22–26:23; Russell Dep. at 18:01–18. In addition to being a Parksley Town Council member and the Supervisor of Public Works, Mr. Nicholson owns an appliance business in Parksley. Nicholson Dep. at 12:13–23.

Lauren Lewis ("Ms. Lewis") is the Parksley Town Clerk. Def. Mem. Supp. Ex. 12 at 8:15–18, ECF No. 57-12 ("Lewis Dep."). Ms. Lewis works with the Parksley Town Council, attends its meetings, takes minutes, collects tax revenue, sends out tax bills, keeps town records, and communicates with the Parksley Town Attorney. *Id.* at 10:04–10; Taylor Dep. at 26:10–16. As Parksley Town Clerk, Ms. Lewis takes care of many of the day-to-day tasks in running the Parksley town government, and contacts the Parksley Mayor when she has questions. Russell Dep. at 8:12–15.

### 2. *Parksley's Sewer System*

Over the years preceding this litigation, Parksley had spent hundreds of thousands of dollars to repair and maintain the functionality of its delicate town sewer

---

Plaintiffs also point to Ms. Lewis's deposition testimony, in which she stated that the Parksley charter would need to be amended before Mr. Nicholson could lawfully be placed in charge of Public Works. *See* Pl. Mem. Supp. at 22, ECF No. 59 (citing Pl. Mem. Supp. Ex. 12 at 105:18–106:01, ECF No. 59-2). Ms. Lewis is neither a lawyer nor an authority on Virginia law. Even if she were, "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006). Therefore, because Plaintiffs have not presented sufficient evidence to the contrary, the Court concludes that Mr. Nicholson's appointment was valid.

4

system. Def. Mem. Supp. Ex. 21, ECF No. 57-21; Taylor Dep. at 54:17–55:05; Russell Dep. at 22:11–14, 35:16–20. If the Parksley sewer system is not functional, *e.g.*, if it has to be shut down because grease is pumped directly into the sewer system, then that circumstance threatens every business in Parksley. Russell Dep. at 22:15–22:20, 33:01–11. If wastewater is put directly into the Parksley sewer system, it can kill the bugs that process the sewer system's contents and maintain its compliance with Virginia Department of Health ("VDH") requirements, thereby costing Parksley thousands of dollars in order to reseed the bugs in the Parksley sewer system. Nicholson Dep. at 215:05–216:11; Def. Mem. Supp. Ex. 6 at 42:05–16, ECF No. 57-6 ("Layne Dep.").

3.    *Mr. Benoir, Ms. Bastien, the Eben-Ezer Variety Market, and EEHFT*

Parksley has experienced changes in recent years, including from an influx of Haitian-Americans. Nicholson Dep. at 47:12–48:16. In 2009, Mr. Benoir and Ms. Bastien, a married couple, immigrated to the United States from Haiti, and received asylum. Am. Compl. ¶ 16. They eventually became American citizens. *Id.* ¶ 17. Like many other Haitian immigrants, Mr. Benoir and Ms. Bastien began life anew in Virginia's Eastern Shore, and in 2018 they moved to Parksley. *Id.* ¶ 18. Since 2019, Mr. Benoir and Ms. Bastien have owned and operated the Eben-Ezer Variety Market (the "Market"), located at 24312 Bennett Street in Parksley, Virginia. *Id.* ¶ 20. The Market is a brick-and-mortar store that sells groceries, home goods, and other merchandise. *Id.*; Stipulation ¶ 1, ECF No. 35.

In addition to the Market, Mr. Benoir and Ms. Bastien are the owners and operators of EEHFT, a food truck, which has been located on the Market's property since 2023. Am. Compl. ¶¶ 21, 28; Stipulation ¶¶ 2, 4, 9–13, ECF No. 35; Stipulation Ex. 4, ECF No. 35-4. EEHFT sold food that was cooked and prepared within the trailer for consumption by customers outside of the trailer. Stipulation ¶ 5, ECF No. 35. EEHFT has no independent means of self-propelled mobility, is permanently parked at the Market, and is located in a Parksley district zoned for Commercial-General uses. *Id.* ¶¶ 10–13; Def. Mem. Supp. Ex. 20 at 17, ECF No. 57-20 ("Parksley Zoning Ordinance").

Prior to EEHFT, Parksley had food trucks in town only temporarily on a short-term basis for special events, normally on public property. Nicholson Dep. at 60:24–61:04, 61:23–62:08, 63:18–63:21. EEHFT was the first permanent food truck in Parksley, whereas in the past other food trucks came into Parksley temporarily for special events and obtained special event permits, which are distinct from special use permits ("SUPs"). Russell Dep. at 15:07–22; Taylor Dep. at 47:25–48:15. Under the Parksley Zoning Ordinance, those uses not specified as permissible in the district zoned for Commercial-General uses can apply for an SUP. Parksley Zoning Ordinance at 27–29; Taylor Dep. at 48:13–15. On May 14, 2023, Plaintiffs applied for, and obtained from Ms. Lewis, a Parksley business license for EEHFT, which allowed them to operate as a permanent establishment—distinct from operating under a special event permit or an SUP. Lewis Dep. at 11:13–12:19, 44:17–45:17, 81:12–16; Def. Mem. Supp. Ex. 13, ECF No. 57-13. At the time the EEHFT Business License was

issued to Plaintiffs, Parksley believed food trucks could operate as permanent establishments under its town zoning ordinance. Def. Mem. Supp. Ex. 11 at 36:13–37:14, ECF No. 57-11.

### 4. Mr. Nicholson's First Visit to EEHFT: May 14, 2023

Minutes after issuing EEHFT's business license on May 14, 2023, Ms. Lewis called Mr. Nicholson and informed him that Plaintiffs wanted approval of a water connection to EEHFT. Nicholson Dep. at 117:13–118:09. After talking with Ms. Lewis, Mr. Nicholson visited EEHFT, where Mr. Benoir and Ms. Bastien showed Mr. Nicholson the inside and outside of the trailer. *Id.* at 118:11–119:06. At that time, the food truck's wastewater line was not yet connected, but upon noticing a hose and the lack of a tank for the disposal of wastewater, Mr. Nicholson advised Plaintiffs that they were not allowed to connect the food truck's wastewater line to the Parksley sewer system. *Id.* at 119:05–120:12. Plaintiffs began operating EEHFT on June 9, 2023.[4]

### 5. Mr. Nicholson's Second Visit to EEHFT: June 15, 2023

Prior to June 15, 2023, Mr. Nicholson witnessed Mr. Benoir and Ms. Bastien serving customers from EEHFT. *Id.* at 113:10–22, 135:22–136:08, 138:20–139:10. On June 15, 2023, Mr. Nicholson was driving past EEHFT on his routine morning trip to purchase coffee when he noticed that EEHFT was directly connected via a PVC

---

[4] Institute for Justice, *Raging Councilman Physically Destroys Innocent Business*, at 1:06–32 (Jan. 23, 2024), https://www.youtube.com/watch?v=MhpE4VsW5kM (Ms. Bastien states that Parksley started "giving her problems" 7 days after her food truck opened. Therefore, as the first "problem" occurred on June 15, 2023, the Court understands that EEHFT began operating on June 9, 2023).

7

pipe to the Parksley sewer system, contrary to his initial advisement. *Id.* at 112:15–113:08, 132:21–133:02; Stipulation ¶ 14, ECF No. 35. Plaintiffs had run a PVC pipe carrying wastewater from EEHFT alongside the Market, into the Parksley sewer system's sewage collection tank. Russell Dep. at 64:04–66:14, 68:10–69:07. Pumping grease from EEHFT directly into the Parksley sewer system threatened to damage the sewer system and cost Parksley thousands of dollars to fix. Layne Dep. at 42:05–16; Def. Mem. Supp. Ex. 21, ECF No. 57-21. EEHFT was connected to the sewer system prior to operating that day. Pl. Resp. Opp'n Ex. 7 ¶ 5, ECF No. 64-7 ("Bastien Decl. Opp'n"); Pl. Resp. Opp'n Ex. 8 ¶ 5, ECF No. 64-8 ("Benoir Decl. Opp'n")).

After seeing the PVC pipe connection to the Parksley sewer system, Mr. Nicholson called Parksley Public Works employee Percy Smith ("Mr. Smith") to come to EEHFT. Nicholson Dep. at 114:05–115:01. Mr. Smith, under Mr. Nicholson's direction, cut the PVC pipe running from EEHFT into the Parksley sewer system. Nicholson Dep. at 114:05–07; Stipulation ¶ 15, ECF No. 35. Mr. Benoir arrived at EEHFT as Mr. Smith was cutting the PVC pipe. Nicholson Dep. at 114:05–06, 116:16–20. After Mr. Benoir arrived, Mr. Nicholson told Mr. Benoir—for a second time—that EEHFT could not be connected to the Parksley sewer system. *Id.* at 116:22–24, 134:02–135:07.

### 6.   *Mr. Nicholson's Third Visit to EEHFT: June 16, 2023*

On the morning of June 16, 2023, Mayor Russell made a telephone call to Mr. Nicholson and told him that he thought EEHFT was again connected to the town's sewer system. *Id.* at 137:13–21. However, this was not true—EEHFT was connected

to an external storage container, not the town's sewer system. *Id.* at 143:11–23; Stipulation ¶ 16, ECF No. 35. EEHFT was parked outside, to the side of the Market. Pl. Mem. Supp. Ex. 33 ¶ 20, ECF No. 59-33 ("Bastien Decl."); Pl. Mem. Supp. Ex. 34 ¶ 20, ECF No. 59-34 ("Benoir Decl."); Pl Mem. Supp. Ex. 13, ECF No. 59-13. The external storage container was located outside behind the Market. Nicholson Dep. at 143:11–23; Bastien Decl. ¶ 19; Benoir Decl. ¶ 19. Someone standing directly in front of the Market and EEHFT would not be able to see the external storage container itself. Bastien Decl. ¶ 33; Benoir Decl. ¶ 33. The connection to the storage container was through a PVC pipe, which ran from EEHFT, along the outside wall of the Market, and then connected to the storage container in the backyard. Pl. Mem. Supp. Ex. 14, ECF No. 59-14.

After receiving Mayor Russell's phone call, Mr. Nicholson went to EEHFT with Michael McCready ("Mr. McCready"). Nicholson Dep. at 140:06–13. Mr. McCready has been an employee of the Parksley Public Works Department since March 2023. Def. Mem. Supp. Ex. 10 at 9:10–18, ECF No. 57-10 ("McCready Dep."). Mr. Nicholson and Mr. McCready arrived at EEHFT that day before business hours. Bastien Decl. ¶ 25; Benoir Decl. ¶ 25. Because it was not during business hours, EEHFT was not in operation, and no one was in EEHFT or the Market. Bastien Decl. ¶¶ 25–26; Benoir Decl. ¶¶ 25–26.

From where Mr. Nicholson and Mr. McCready were standing in front of EEHFT, it appeared to both men that EEHFT had been re-connected to the Parksley sewer system located behind the Market. McCready Dep. at 10:15–20, 13:24–14:01;

9

Nicholson Dep. at 141:20–24, 219:11–17, 220:14–221:01. Mr. Nicholson also believed that Mr. Benoir and Ms. Bastien had re-connected EEHFT to the Parksley sewer system based on their earlier disregard of his instructions not to do so. Nicholson Dep. at 221:02–07. Mr. Nicholson therefore told Mr. McCready to cut the PVC pipe. McCready Dep. at 12:24–13:03, 14:02–14; Nicholson Dep. at 142:24–143:02; Def. Mem. Supp. Ex. 14, ECF No. 57-14. However, Mr. Nicholson and Mr. McCready made no effort to determine whether EEHFT was actually connected to Parksley's sewer system prior to cutting the pipe. Nicholson Dep. at 142:14–16. Mr. McCready believed that Mr. Nicholson was instructing him to cut the PVC pipe in Mr. Nicholson's capacity as Supervisor of Public Works. McCready Dep. at 41:14–22.

Mr. Nicholson did not call law enforcement because Parksley employs only 1 police officer, who was not on duty that morning. Nicholson Dep. at 240:11–241:10. Mr. McCready, at the direction of Mr. Nicholson, proceeded to cut the PVC pipe. McCready Dep. at 14:05–14:14, 41:14–22; Nicholson Dep. at 140:07–17. Mr. Nicholson ordered Mr. McCready to remove a section from the pipe to make it harder to repair, which Mr. McCready did. Nicholson Dep. at 140:14–141:06; Pl. Mem. Supp. Ex. 15, ECF No. 59-15.

As Mr. McCready cut the PVC pipe, Mr. Benoir approached and informed Mr. Nicholson that EEHFT was no longer hooked up to the Parksley sewer system. Nicholson Dep. at 141:06–17, 143:05–10. After the PVC pipe was cut, Mr. Benoir personally took Mr. Nicholson around the back side of EEHFT and showed him that EEHFT had actually been connected to an external storage tank located at the back

of the Market that day. *Id.* at 143:12–17. Other than with respect to the Plaintiffs, Mr. Nicholson has never cut or instructed someone else to cut another water discharge pipe. *Id.* at 133:06–08. Mr. Nicholson is not aware of anyone from Parksley's Public Works Department ever cutting anyone's water discharge pipe. *Id.* at 133:20–134:02.

Violations of the Parksley Water/Sewage Ordinance also violate Virginia state law and regulations. *Id.* at. 147:16–148:01; Def. Mem. Supp. Ex. 19 at 2, ECF No. 57-19. However, William L. Pfeiffer ("Mr. Pfeiffer"), an employee with the VDH who conducted health and environmental inspections of EEHFT, stated that VDH itself would never cut a PVC pipe based on a notice of alleged violation, nor would it even physically remove a connection at the end of a process, even if a violation were found. Pl. Mem. Supp. Ex. 16 at 40:09–41:19, ECF No. 59-16 ("Pfeiffer Dep."). Furthermore, Parksley's Water/Sewage Ordinance provides that "[Parksley] may commence an action for appropriate legal and/or equitable relief to assure the abatement of [a] nuisance." Def. Mem. Supp. Ex. 19 at 2, ECF No. 57-19.

7. *Mr. Nicholson's Fourth Visit to EEHFT: June 17, 2023*

On June 17, 2023, Mr. Nicholson returned to the Market, and an altercation ensued between Plaintiffs and Mr. Nicholson.[5] Nicholson Dep. at 77:15–91:16. Ms. Bastien successfully obtained a restraining order against Mr. Nicholson as a result of

---

[5] The parties largely disagree about the nature of the altercation on June 17, 2023. Accordingly, it is addressed in greater detail in the disputed material facts section. *See infra* pp. 19–21.

the June 17, 2023 interaction. Bastien Decl. Opp'n ¶ 16; Benoir Decl. Opp'n ¶ 16; Pl. Resp. Opp'n Ex. 1 ¶ 10, ECF No. 64-1.

> ### 8. *Alleged Health and Environmental Violations: July 2023*

On July 13, 2023, Mr. Pfeiffer conducted an inspection of EEHFT based upon a complaint from Mr. Layne. Pfeiffer Dep. at 22:14–18.[6] On July 17, 2023, Mr. Pfeiffer conducted a second inspection of EEHFT based upon another complaint from Mr. Layne that Plaintiffs were violating certain state health and environmental laws. *Id.* at 27:21–28:21. Mr. Layne accompanied Mr. Pfeiffer during his investigation into alleged illegal dumping by Plaintiffs onto the property beside the Market. Layne Dep. at 18:23–20:07. During that investigation, Mr. Pfeiffer and Mr. Layne found grease buckets behind the food truck on the back of the Market's property by a shed and black spots indicating the grease had been dumped. Pfeiffer Dep. at 30:22–31:05, 33:02–11; Layne Dep. at 19:18–21:08, 98:10–102:01; Def. Mem. Supp. Ex. 23, ECF No. 57-23.

That same day, based on Mr. Pfeiffer's reported observations, Mr. McCready issued a Code and Ordinance Violation Notice to Mr. Benoir for the discharge of wastewater from EEHFT in violation of Parksley's Water/Sewage Ordinance (the "July 17 Violation Notice"). McCready Dep. at 21:18–21:20, 22:06–23:17; Stipulation Ex. 10, ECF No. 35-10. The July 17 Violation Notice imposed a $2,500 fine, which remains unpaid by Plaintiffs. Stipulation Ex. 10, ECF No. 35-10; Stipulation ¶ 26, ECF No. 35.

---

[6] The record does not indicate the outcome of the July 13, 2023 inspection.

12

Also on July 17, 2023, Mr. Layne emailed Mr. Pfeiffer a picture of an area of wetness on Bennett Street *in front of* EEHFT. Pfeiffer Dep. at 31:20–32:18. The picture was going to be a part of an additional alleged notice of violation that was going to be sent to Plaintiffs. *Id.* However, it was eventually determined that Plaintiffs were not responsible for the wet spot on the street in front of EEHFT. Nicholson Dep. at 172:01–174:14; Layne Dep. at 29:23–30:24.

     9.     *The Food Truck Ban: October 9, 2023*

On October 9, 2023, the Parksley Town Council held a meeting. Def. Mem. Supp. Ex. 18, ECF No. 57-18. At the meeting, the Parksley Town Council unanimously passed a motion appointing André Wiggins ("Mr. Wiggins") as Town Attorney and discussed whether food trucks should be banned in Parksley. *Id.* at DEF000123–DEF000124. During the Town Council's discussions over whether to ban food trucks, several government officials, including councilmembers, stated that food trucks should be banned to protect Parksley's restaurants from competition. Pl. Mem. Supp. Ex. 18 at 4:02–6:44, ECF No. 59-18. Ultimately, the Parksley Town Council passed Ordinance 23-01 (the "Food Truck Ban"). Def. Mem. Supp. Ex. 18 at DEF000123, ECF No. 57-18. The Food Truck Ban banned permanent food trucks, but allowed food trucks to operate for up to 72 hours at a time under a special event permit. Pl. Mem. Supp. Ex. 17, ECF No. 59-17. At the meeting, Mayor Russell publicly announced that Parksley did not intend to enforce the Food Truck Ban against Plaintiffs until their annual business license expired in May 2024. Pl. Mem. Supp. Ex. 19 at 4, ECF No.

59-19. Plaintiffs therefore continued to operate EEHFT. Bastien Decl. ¶ 71; Benoir Decl. ¶ 75.

### 10.     *Plaintiffs Speak to the Media: October 2023*

In mid-October 2023, Mr. Benoir and Ms. Bastien began speaking with members of the news media about their view that the town should repeal the Food Truck Ban or otherwise work something out with them before their annual business license was scheduled to expire in May 2024. Bastien Decl. ¶ 73; Benoir Decl. ¶ 77. This resulted in news coverage on October 19, 2023, and subsequent dates. Pl. Mem. Supp. Ex. 35 ¶¶ 12–13, ECF No. 59-35 ("Monel Decl."); Pl. Mem. Supp. Ex. 20, ECF No. 59-20. Mayor Russell stated that the media coverage had "upset [his] little town[.]" Pl. Mem. Supp. Ex. 10 at 44:08–09, ECF No. 59-10. Mayor Russell also testified that he blamed Plaintiffs' counsel, the non-profit Institute for Justice, for helping Plaintiffs obtain media attention that was unfavorable to the town. *Id.* at 94:18–95:09. Mayor Russell further stated that the Institute for Justice:

> [T]ook this little simple thing and blew it up into a gigantic story that was all over the internet, all over the newspapers, and you guys did it. You sent it out. You CC'd it to everybody. You are the ones that promoted this. If you hadn't got involved in this, we would have worked out something with these poor people and they would be selling hotdogs right now. But you guys were the ones who promoted all this hate and discontent and dissatisfaction. The Institute for Justice did that.

*Id.* at 98:12–24 (cleaned up). In Mayor Russell's view, the media attention that the Institute for Justice helped Plaintiffs obtain was like a "atom bomb" that cost Parksley its reputation. *Id.* at 56:03–04, 96:20–21.

14

11.    *Parksley Reverses Its Stance and Instructs Mr. Wiggins to Draft a Letter Informing Plaintiffs That They Must Comply With the Food Truck Ban Immediately: October 19, 2023*

On October 19, 2023, Ms. Lewis emailed Mr. Wiggins and attached the Food Truck Ban. Pl Mem. Supp. Ex. 20, ECF No. 59-20.[7] Therein, Ms. Lewis stated, "I need a letter to send [Plaintiffs] informing them of the [Food Truck Ban] and notifying them that they have to comply and cannot continue to operate as they have been." *Id.* She also states, "I've been informed by a family member of the [Plaintiffs] that [Ms. Bastien] is 'sue happy' and thinks everyone is out to get her. So I've informed [Mayor Russell] and [the Parksley Town Council] that I will not write this letter to them as I'm uncomfortable doing so. I also just received a phone call from [Mayor Russell] (whose auto repair shop is next door to the [M]arket and [EEHFT]) informing me that they have a TV crew out there currently. Great times." *Id.*

12.    *Mr. Wiggins Realizes That the Food Truck Ban Was Unnecessary, As Food Trucks Were Already Prohibited By the Town Zoning Ordinance: October 27, 2023*

While Mr. Wiggins was drafting the letter requested by Ms. Lewis, he realized that food trucks were already prohibited by the town's pre-existing zoning ordinance. Pl. Mem. Supp. Ex. 26 at 1, ECF No. 59-26; Parksley Zoning Ordinance at 27–29 (providing a list of uses and structures permitted within the commercial district which does not include food trucks, and providing that all other uses could obtain an SUP). As of October 27, 2023, Mr. Wiggins was still making revisions to the Food

---

[7] It was common practice for Ms. Lewis to send and receive emails on behalf of Mayor Russell. Pl. Mem. Supp. Ex. 10 at 11:19–12:08, 30:17–25, ECF No. 59-10.

15

Truck Ban, as directed by the Parksley Town Council. Pl. Mem. Supp. Ex. 24, ECF No. 59-24. On Friday, October 27, 2023, Mr. Wiggins emailed Ms. Lewis at 2:24 p.m., "Let's chat briefly at your convenience re: Food trucks." Pl. Mem. Supp. Ex. 25, ECF No. 59-25. At 3:50 p.m. that same day, Ms. Lewis responded, "Hey I've had people in my office allllll afternoon, I'm sorry. Feel free to call Monday as early as 845. Have a great weekend." *Id.* However, it appears that Ms. Lewis and Mr. Wiggins did talk that day; on Monday, October 30, 2023, Ms. Lewis emailed Mr. Wiggins and stated, "I spoke with [Mayor Russell] Friday after you and I talked and let him know about the zoning ordinance prohibiting the food truck ever having been there to begin with." Pl. Mem. Supp. Ex. 26 at 1, ECF No. 59-26. Therefore, Mr. Wiggins first learned, and Mayor Russell was first informed, that there was already a zoning ordinance in place which prohibited EEHFT from operating permanently in the commercial district of Parksley on Friday, October 27, 2023. *Id.*

On November 1, 2023, Mr. Wiggins emailed a letter to Ms. Lewis regarding Plaintiffs' violation of the Parksley Zoning Ordinance through operation of EEHFT (the "Wiggins Letter"), for the purpose of Mayor Russell's review. Lewis Dep. at 84:12–20, 86:08–87:02, 89:16–23, 92:15–19; *see also* Pl. Mem. Supp. Ex. 30, ECF No. 59-30. That same day, November 1, 2023, Ms. Lewis provided the Wiggins Letter to Mayor Russell; Mayor Russell reviewed it and approved it with no changes. Lewis Dep. at 92:20–93:13, 96:09–97:02. At 2:58 p.m. on November 1, 2023, Ms. Lewis conveyed to Mr. Wiggins via email that Mayor Russell had approved the Wiggins Letter. *Id.* at 96:15–97:02.

16

On the morning of November 2, 2023, Plaintiffs' counsel emailed a letter to Defendants asserting that the Food Truck Ban may be unconstitutional (the "Institute for Justice Letter"). Pl. Mem. Supp. Ex. 27, ECF No. 59-27; Pl. Mem. Supp. Ex. 28, ECF No. 59-28. Later that same day, having read the Institute for Justice Letter, Mr. Wiggins told Ms. Lewis that the Food Truck Ban was "unconstitutional and violates [Virginia] state law." Pl. Mem. Supp. Ex. 29, ECF No. 59-29. Ms. Lewis communicated this message to the Parksley Town Council via email. *Id.*

On November 3, 2023, Mr. Wiggins sent the Wiggins Letter to Plaintiffs. Pl. Mem. Supp. Ex. 30, ECF No. 59-30. The letter stated, *inter alia*:

> As I understand it you have operated a Food Truck in the Commercial District of Parksley for some time. Please be advised that such use is not allowed pursuant to the Town's longstanding Zoning Ordinance and that the Town's Zoning Ordinance (Article VIII) contains the following provision with respect to violations:
>
> **Any person who violates any provision of this ordinance or any amendment thereto, or who fails to perform any act required hereunder or does any prohibited act, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not more than two hundred fifty dollars ($250) or imprisonment in the county jail for not more than thirty (30) days, or both, for each offense. Each and every day on which any violation is committed or permitted to continue shall constitute a separate offense and shall be punishable as such hereunder. Any violation of this ordinance is hereby declared to be a public nuisance per se and shall be enjoined to cease.** See Parksley Zoning Ordinance 56 Article VIII Administration and Enforcement-5 Violations and Penalties.
>
> Please cease operation immediately to avoid further action related to this ongoing violation of the Town's Zoning Ordinance.

*Id.* at 3. The Wiggins Letter's mention of possible imprisonment and fines terrified Plaintiffs and caused them to stop operating their food truck. Benoir Decl. ¶ 92;

17

Bastien Decl. ¶ 88. That same day, Mr. Wiggins emailed Ms. Lewis and warned that Parksley should "be prepared for the assertion" that the positions being taken in the Wiggins Letter were being made "out of spite[.]" Pl. Mem. Supp. Ex. 31 at 1, ECF No. 59-31.

### 13. Parksley Repeals the Food Truck Ban: November 14, 2023

On November 14, 2023—at the first town council meeting following the Food Truck Ban's enactment on October 9, 2023—the Food Truck Ban was repealed by the Parksley Town Council. Lewis Dep. at 80:23–25; Def. Mem. Supp. Ex. 22 at DEF000129, ECF No. 57-22. The Parksley Town Council took the position that the Food Truck Ban was unnecessary because food trucks were already banned by the Parksley Zoning Ordinance's catch-all provision. Pl. Mem. Supp. Ex. 10 at 89:05–11, ECF No. 59-10.

### 14. Plaintiffs' Representative Meets with Parksley Officials: November 18, 2023

Reverend Calherbe Monel ("Reverend Monel") is a resident of Virginia and an ordained Christian Reverend. Monel Decl. ¶¶ 2–3. He has several churches under his ministry, which is named Christians United for Haiti. *Id.* ¶ 3. Reverend Monel's ministry provides assistance to those in need in Haiti and is also involved in Virginia's Haitian-American community. *Id.* ¶ 5. When he learned of the Food Truck Ban, he attempted to help Plaintiffs. *Id.* ¶ 6. On November 15, 2023, Reverend Monel emailed Ms. Lewis and requested a letter stating that EEHFT could resume business. Def. Mem. Supp. Ex. 24 at PLS0059, ECF No. 57-24. The next day, Ms. Lewis informed Reverend Monel that Plaintiffs could apply for a SUP in order operate EEHFT in

18

Parksley. *Id.* Ms. Lewis also informed Reverend Monel that Plaintiffs had not come into the Parksley town office or approached anyone regarding pursuing the SUP option. *Id.* at PLS0058.

On or about November 18, 2023, Reverend Monel met with Mayor Russell, Ms. Lewis, Mr. Layne, and other Parksley officials. Monel Decl. ¶¶ 9–10. During the meeting, Mayor Russell talked at length about how angry he was at Mr. Benoir and Ms. Bastien for the media attention that depicted Parksley's government in a negative light. *Id.* ¶ 12. Mayor Russell stated that Parksley's government had always been nice to Ms. Bastien and Mr. Benoir, so he viewed the fact that they talked to the media as a betrayal. *Id.* ¶ 13. Reverend Monel talked with the Parksley officials about whether Ms. Bastien and Mr. Benoir could apply for an SUP for EEHFT. *Id.* ¶ 14. Mayor Russell and other town officials said that although permanent food trucks were banned, SUPs could still be used to operate food trucks. *Id.* Plaintiffs have never filed for an SUP. Lewis Dep. at 81:25–82:02.

## B. Disputed Material Facts

There are 3 material pieces of this story which are in dispute. First, the parties dispute whether Mr. Nicholson and Mr. McCready physically entered Plaintiffs' property on June 16, 2023, when the pipe was cut for a second time. *See* Def. Mem. Supp. ¶¶ 55–57 (citing Nicholson Dep. at 227:15–229:16, 140:01–05); Pl. Resp. Opp'n at 8, ECF No. 64 (citing Benoir Decl. Opp'n ¶¶ 6, 18; Bastien Decl. Opp'n ¶¶ 6, 18).

Second, the parties disagree about whether the PVC pipe needed to be cut immediately on June 16, 2023 to prevent damage to the Parksley sewer system. Def.

19

Mem. Supp. ¶ 51 (citing Nicholson Dep. at 234:12–14, 237:12–238:01, 239:01–239:08, 241:21–242:09); Pl. Mem. Supp. ¶ 45, ECF No. 59 (citing Bastien Decl. ¶ 27).

Third, the parties disagree entirely about the events that occurred on June 17, 2023. *See generally* Pl. Mem. Supp. ¶¶ 61–76, ECF No. 59; Def. Resp. Opp'n at 9–11, ECF No. 63. Plaintiffs contend the following, which Defendants dispute entirely: On June 17, 2023, Mr. Nicholson saw that a delivery truck driver was attempting to deliver goods to their store. Bastien Decl. ¶ 37; Benoir Decl. ¶ 41.[8] Mr. Nicholson allegedly yelled at the delivery truck driver and at Ms. Bastien that Parksley was his city, and that he could order anyone to leave based on his authority as Parksley Town Council member. Bastien Decl. ¶¶ 38–45; Benoir Decl. ¶¶ 42–49. Mr. Nicholson then yelled at Ms. Bastien, "Go back to your own country!" Bastien Decl. ¶ 46; Benoir Decl. ¶ 50. Officers from the Accomack County Sheriff's Office saw the disturbance and stopped. Bastien Decl. ¶ 47; Benoir Decl. ¶ 51. The officers attempted to calm Mr. Nicholson down, and Mr. Nicholson told them that he was acting within his authority as a member of Parksley's Town Council. Bastien Decl. ¶¶ 53–55; Benoir Decl. ¶¶ 57–59. Mr. Nicholson stormed off, got in his vehicle, and parked in front of the store so that the delivery could not be made. Bastien Decl. ¶¶ 56–59; Benoir Decl. ¶¶ 60–63. The officers ordered Mr. Nicholson to move his vehicle so that the delivery could be made. Bastien Decl. ¶ 60; Benoir Decl. ¶ 64. Mr. Nicholson refused and walked away angrily; however, someone else moved the vehicle so that the delivery driver could

---

[8] Mr. Nicholson testified that the truck was parked on top of a public sidewalk with a waterline underneath. Nicholson Dep. at 77:15–80:06.

20

finally make the delivery to Plaintiffs' store. Bastien Decl. ¶¶ 61–63; Benoir Decl. ¶¶ 65–67.

## II.   PROCEDURAL HISTORY

On January 23, 2024, Plaintiffs filed their Complaint. Compl., ECF No. 1. On February 19, 2024, Defendants filed their Answer. Ans., ECF No. 20. On April 16, 2025, Plaintiffs filed an Amended Complaint, after receiving leave to do so. Am. Compl. Therein, Plaintiffs allege illegal search and seizure against Mr. Nicholson personally, in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments (Count 1); illegal search and seizure against Parksley and against Mr. Nicholson in his official capacity, in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments (Count 2); an equal protection claim against Mr. Nicholson personally, in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment (Count 3); an equal protection claim against Parksley and against Mr. Nicholson in his official capacity, in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment (Count 4); trespass to land and trespass to chattels against Mr. Nicholson personally, in violation of Virginia state law (Count 5); and retaliation against Parksley, in violation of 42 U.S.C. § 1983 and the First and Fourteenth Amendments (Count 6). *Id.* ¶¶ 147–418.[9]

---

[9] "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 165–66

On April 21, 2025, Defendants filed the Parksley Motion. Mot., ECF No. 56. Therein, Defendants move the Court to grant summary judgment in favor of the Defendants on all 6 claims alleged in the Amended Complaint. *Id.* On May 5, 2025, Plaintiffs filed their response in opposition to the Parksley Motion. Pl. Resp. Opp'n, ECF No. 64. On May 12, 2025, Defendants filed their reply. Def. Reply, ECF No. 66. The Parksley Motion is ripe for adjudication.

On April 21, 2025, Plaintiffs filed the Benoir Motion. Mot., ECF No. 58. Therein, Plaintiffs move the Court to grant summary judgment in favor of the Plaintiffs on all claims except Counts 3 and 4, which Plaintiffs argue are not suitable to be resolved at the summary judgment stage. Pl. Mem. Supp. at 18 n.2, ECF No. 59. On May 5, 2025, Defendants filed their response in opposition to the Benoir Motion. Def. Resp. Opp'n, ECF No. 63. On May 12, 2025, Plaintiffs filed their reply. Pl. Reply, ECF No. 65. The Benoir Motion is ripe for adjudication.

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

---

(1985) (internal quotation marks and citations omitted). "Based upon the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources." *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 49 (D.D.C. 2005) (internal quotation marks omitted). Here, Counts 2 and 4 allege constitutional violations against Parksley and Mr. Nicholson in his official capacity. Because it is duplicative to name both Parksley and its employee in its official capacity, Counts 2 and 4 are **DISMISSED** as to Mr. Nicholson.

P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party seeking summary judgment bears the initial burden of establishing the basis of its motion and identifying materials in the record that demonstrate the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–25. When the moving party meets its burden, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The nonmoving party must present more than a scintilla of evidence in its favor. *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995).

If "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal quotation marks and citation omitted). "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, a court should discredit the nonmoving party's version of events where it is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also XVP Sports, LLC v. Bangs*, No. 2:11cv379, 2012 WL 4329258, at *4 (E.D. Va. Sept.

17, 2012) ("[W]hen ruling on a summary judgment motion, a court may also give credence to other facts supporting the movant, regardless of their source, if such facts are not challenged by the non-moving party because a failure to challenge proffered facts may render such facts 'admitted.'") (internal quotation and citations omitted).

## IV.   ANALYSIS[10]

### A.   Federal Claims: 42 U.S.C. § 1983 (Counts 1, 2, 3, 4, and 6)

"Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). "When it comes to defenses to liability [in a § 1983 action], an official in a

---

[10] Defendants contend that Plaintiffs (1) lack standing to bring the lawsuit; and (2) have failed to exhaust their administrative remedies. Def. Mem. Supp. at 19–20. Such arguments are meritless.

With respect to standing, Defendants argue that because, according to Defendants, EEHFT was never legally in operation under the Parksley Zoning Ordinance, Plaintiffs cannot argue that they were injured when EEHFT was shut down. *Id.* (citing *Segaloff v. Newport News*, 163 S.E.2d 135 (Va. 1968)). First, *Segaloff* does not stand for the proposition that improperly-issued permits authorize municipal officials to violate the constitutional rights of permit owners, nor to commit intentional tort against such owners. Furthermore, *Segaloff* was overturned by *Board of Supervisors of Richmond County v. Rhoads*, 803 S.E.2d 329 (Va. 2017). In that case, the Supreme Court of Virginia affirmed that a 1995 Virginia statute overturned *Segaloff*, indicating that such statute was "intended to eliminate the hardship property owners have suffered when they rely to their detriment upon erroneous or void zoning decisions." *Id.* at 333. As Defendants have presented no sound arguments to the contrary, Plaintiffs have standing to bring each of their claims.

With respect to administrative exhaustion, Defendants argue that because Plaintiffs never applied for an SUP for EEHFT, they have failed to exhaust their administrative remedies before bringing the instant lawsuit. Def. Mem. Supp. at 20. The Court is not aware of any administration exhaustion doctrines that would be relevant to the instant action, and Defendants have not cited any authority to support their claim that administrative exhaustion is necessary here.

personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such as objectively reasonable reliance on existing law." *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This is known as qualified immunity.

If it is not shown that the official is entitled to qualified immunity, the plaintiff must demonstrate that the official is personally liable for the § 1983 claim. To demonstrate personal liability, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

With respect to whether *Parksley* can be held liable for any constitutional violations committed by Mr. Nicholson or other town officials, private entities can be held vicariously liable for the actions of their employees under a theory of respondeat superior, but "municipal governments [cannot] be held vicariously liable for the constitutional torts of their employees." *City of Canton v. Harris*, 489 U.S. 378, 394 (1989) (O'Connor, J., concurring in part). Instead, "[i]n *Monell*, the [Supreme] Court held that municipal liability can be imposed under § 1983 only where the municipality, as an entity, can be said to be 'responsible' for a constitutional violation committed by

25

one of its employees." *Id.* (citing *Monell v. Dep't. of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690 (1978)).

Therefore, with respect to Plaintiffs' federal claims, the Court will first consider whether Mr. Nicholson is entitled to qualified immunity for the alleged violation of Plaintiffs' Fourth and Fourteenth Amendment rights, and if not, whether he is personally liable for such violation (Count 1). Then, the Court will consider whether Parksley is liable under *Monell* for such actions (Count 2). Next, the Court will consider whether Mr. Nicholson is entitled to qualified immunity for the alleged violation of Plaintiffs' equal protection rights under the Fourteenth Amendment, and if not, whether he is personally liable for such violation (Count 3). Then, the Court will consider whether Parksley is liable under *Monell* for such actions (Count 4). Finally, the Court considers whether Parksley is liable for retaliating against Plaintiffs in violation of their First Amendment rights (Count 6).

> 1.   *Illegal Search and Seizure against Mr. Nicholson Personally, in Violation of 42 U.S.C. § 1983—Fourth and Fourteenth Amendments (Count 1)*
>
>   a.   *Qualified Immunity*

Analyzing whether an official is entitled qualified immunity is a two-step procedure wherein the Court first asks (1) "whether a constitutional violation occurred," and then asks (2) "whether the right violated was clearly established." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (internal quotation marks omitted). Both steps of the analysis require a "reasonableness" inquiry. *Id.* at 531–33 (finding that a Fourth Amendment violation occurred under the first prong because defendant used

objectively *unreasonable* force and that the right was clearly established under the second prong because a *reasonable* official would have understood that what he is doing violates that right).

With respect to the first step, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 531 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Regarding the second step, "a clearly established right is one that is sufficiently clear such that every reasonable official would have understood that what he is doing violates that right." *Keenan v. Ahern*, 524 F. Supp. 3d 472, 479 (E.D. Va. 2021) (citation modified). "There need not be a case 'directly on point' in order for an officer to know his or her conduct violates a clearly established right, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 584 (4th Cir. 2017)).

"The plaintiff bears the burden on the first prong [of the qualified immunity analysis], and the officer bears the burden on the second prong." *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). Accordingly, here, Plaintiffs bear the burden of demonstrating that Mr. Nicholson's actions were objectively unreasonable in light of the facts and circumstances that confronted him, and that a Fourth Amendment violation occurred. Defendants bear the burden of establishing that not every reasonable official would have understood that Mr. Nicholson was violating Plaintiffs' Fourth Amendment rights. The Court considers each prong in turn.

i.      Mr. Nicholson's Actions Were Objectively Unreasonable

"The Supreme Court [has] held that administrative searches by health and housing officials constituted significant intrusions on Fourth Amendment interests, and that such searches, when authorized and conducted without a warrant procedure, lack the traditional safeguards guaranteed by the Fourth Amendment." *Nixon v. Montgomery County*, 251 F. App'x 141, 145 (4th Cir. 2007) (citing *Camara v. Mun. Ct. of San Franscisco*, 387 U.S. 523 (1967)). However, "reasonableness, rather than a warrant, is the ultimate standard under the Fourth Amendment[.]" *Id.* (internal quotation marks omitted). In *Nixon*, the Fourth Circuit held under the first prong of the qualified immunity analysis that the municipality acted reasonably, despite lacking a warrant, when it "afforded [plaintiff] numerous procedural guarantees before it entered her property, including prior written notice, a 10-day waiting period, and the opportunity to appeal to a board of appeals." *Id.*

Here, there was no such reasonableness. Mr. Nicholson went to EEHFT before business hours on June 16, 2023—Plaintiffs were not present and EEHFT was not in operation. Bastien Decl. ¶¶ 25–26; Benoir Decl. ¶¶ 25–26. He rashly and incorrectly determined that EEHFT was connected to the sewer system, and directed a Public Works employee to cut EEHFT's pipe. Nicholson Dep. at 142:14–143:23; Stipulation ¶ 16, ECF No. 35; McCready Dep. at 12:24–13:03. He made no attempt to contact Plaintiffs, gather more information, provide formal notice, or provide a waiting period or an opportunity to appeal—despite Mr. Benoir and Ms. Bastien living just 2 blocks

away from EEHFT. Nicholson Dep. at 142:14–22. This is so despite Parksley's Water/Sewage Ordinance providing a potential solution for nuisance abatement—the commencement of an action. Def. Mem. Supp. Ex. 19 at 2, ECF No. 57-19. Moreover, Mr. Nicholson directed Mr. McCready to cut a section of the pipe to make it harder to repair. Nicholson Dep. at 140:14–141:06. Mr. Nicholson has never cut or instructed someone else to cut another water discharge pipe, and he is not aware of anyone from Parksley's Public Works Department ever cutting anyone's water discharge pipe. *Id.* at 133:06–134:02. Mr. Pfeiffer, a VDH employee, testified that VDH itself would never physically cut a pipe, even if a nuisance were definitively found. Pfeiffer Dep. at 40:09–41:19.

Mr. Nicholson contends that because Plaintiffs were hooked up to the sewer system on June 15, 2023, and Mr. Nicholson responded by cutting their pipe that day, he did not feel obligated to provide further notice to Plaintiffs before cutting their pipe on June 16. Nicholson Dep. at 236:03–237:11. In the Court's view, because there was no due process on either day, neither act was reasonable—Mr. Nicholson's rashness on June 15 does not perversely justify additional rashness on June 16 just because he was under the mistaken impression that Plaintiffs "didn't abide by" his directions the first time. *Id.*

Defendants also argue that Parksley's fragile sewer system created exigent circumstances which rendered Mr. Nicholson's actions reasonable. *See* Def. Mem. Supp. at 27. Exigency is an exception to the Fourth Amendment's reasonableness requirement. *United States v. Curry*, 965 F.3d 313, 321 (4th Cir. 2020). However, "the exigent

circumstances exception is a narrow one . . . [and] the Supreme Court, to date, has identified only a few emergency conditions that rise to the level of exigent circumstances." *Id.* (citation modified). "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *United States v. Taylor*, 624 F.3d 626, 631 (4th Cir. 2010) (internal quotation marks omitted). "Indeed, standing alone, even a possible homicide does not present an emergency situation demanding immediate warrantless action." *Curry*, 965 F.3d at 322 (citation modified). Even if Plaintiffs had been connected to Parksley's sewer system on June 16, which plausibly could have been financially costly for Parksley, such circumstances fall far short of the exigency exception—human life or serious injury were not at stake. Moreover, Plaintiffs were not actually connected to Parksley's sewer system. The Court cannot find that Mr. Nicholson's actions were reasonable based on a mythical exigency.

In conclusion, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks omitted). Furthermore, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). The Court finds that Mr. Nicholson's decision to cut the pipe on June 16, 2023, without making any effort to determine whether there was actually a threat to the Parksley sewer system or any effort to provide Plaintiffs with even minimal due process, was unreasonable and a

30

transgression of a bright line. Therefore, Plaintiffs have met their burden of showing that Mr. Nicholson's actions were objectively unreasonable, and the Court finds that a Fourth Amendment violation occurred.

### ii. The Violated Right Was Clearly Established

Defendants contend that "Plaintiffs fail to state any violation of clearly established rights." Def. Mem. Supp. at 27. Defendants misunderstand that, in this Circuit, they have the burden of demonstrating that the violated right was not clearly established. *Stanton*, 25 F.4th at 233. "There need not be a case directly on point in order for an officer to know his or her conduct violates a clearly established right, but existing precedent must have placed the statutory or constitutional question beyond debate." *Keenan*, 524 F. Supp. 3d at 479 (internal quotation marks omitted).

The right at issue here is the right to be free from the warrantless physical destruction or seizure of private property by a municipal official, absent due process or exigent circumstances. The Court finds that existing precedent places this question beyond debate. Supreme Court and Fourth Circuit authority, as well as out-of-circuit cases, make clear that every reasonable official would have known that Mr. Nicholson's actions were in violation of the Fourth Amendment, because every case shows that there must be *some* measure of due process. *See, e.g., Soldal v. Cook County*, 506 U.S. 56, 71 (1992) (noting that activities such as repossessions and attachments, while they may survive constitutional scrutiny, are still subject to the reasonableness standard); *Nixon,* 251 F. App'x at 145 (finding no evidence that any county official knowingly violated the law, because the officials reasonably believed they had

31

comported with the law when they afforded plaintiff due process regarding her housing code violations, and thereafter entered and cleaned her property of such violations); *Embassy Realty Invs., Inc. v. City of Cleveland,* 572 F. App'x 339, 345 (6th Cir. 2014) ("[Plaintiff] had been afforded adequate due process relating to the condemnation proceedings and, therefore, the warrantless entrance on the [p]roperty to remediate the established nuisance was reasonable under the Fourth Amendment."); *Santana v. City of Tulsa*, 359 F.3d 1241, 1245 (10th Cir. 2004) ("[A]s long as procedural due process standards are met and no unreasonable municipal actions are shown, a nuisance abatement action does not violate the Fourth Amendment."); *Freeman v. City of Dallas*, 242 F.3d 642, 652–53 (5th Cir. 2001) ("Regulation of nuisance properties is at the heart of the municipal police power . . . [n]evertheless, a city may not arbitrarily enter abatement orders or declare the existence of nuisances with no underlying standards."); *Samuels v. Meriwether,* 94 F.3d 1163, 1168 (8th Cir. 1996) ("[A]n abatement carried out in accordance with procedural due process is reasonable in the absence of any factors that outweigh governmental interests."); *Taylor v. Town of Franklin*, No. 2:06cv13, 2007 WL 674577, at *2 (W.D.N.C. Feb. 28, 2007) (finding that the seizure of property which is a public nuisance is not objectively unreasonable where plaintiff had notice via certified mail that her property had been declared a nuisance).

In sum, this authority demonstrates that every reasonable official would know that they were required to comport with due process standards when abating Plaintiffs' imagined nuisance on June 16, 2023. Therefore, the second prong has not been

32

met, and Mr. Nicholson is not entitled to qualified immunity for his Fourth Amendment violation.

### b.    *Personal Liability*

As Mr. Nicholson does not enjoy qualified immunity, the Court considers whether he is personally liable under Count 1. "[T]o establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky*, 473 U.S. at 166 (citation modified).

The Court has already found *supra* pp. 28–31 that Mr. Nicholson caused the deprivation of Plaintiffs' Fourth Amendment rights when he unreasonably seized their pipe on June 16, 2023.[11] Furthermore, the parties agree that Mr. Nicholson was acting under color of state law when he cut the pipe on June 16, 2023. Def. Mem. Supp. at 26 ("[Mr.] Nicholson acted within the scope of his appointed capacity of Supervisor of Public Works on June 16, 2023, and at all other times relevant[.]"); Pl. Mem. Supp. at 18, ECF No. 59 ("[Mr.] Nicholson's admittedly wrongful actions caus[ed] Plaintiffs' pipe to be cut while acting under color of law[.]"). Therefore, Mr.

---

[11] The Court does not treat Mr. Nicholson's cutting of the pipe on June 15, 2023 as an alleged constitutional violation when assessing Counts 1 through 4. Plaintiffs did not raise the cutting of the pipe on June 15, 2023 in their Amended Complaint. *See generally* Am. Compl. Furthermore, Plaintiffs state that the events of June 15, 2023 are immaterial to the causes of actions before the Court. Pl. Resp. Opp'n at 5, ECF No. 64. The Court has included the events of June 15, 2023 in the factual background section to paint the full picture of Plaintiffs' interactions with Mr. Nicholson, and to demonstrate his state of mind when he cut the pipe on June 16, 2023.

Nicholson is personally liable under § 1983 for the cutting of Plaintiffs' pipe on June 16, 2023, which was in violation of their Fourth Amendment rights.

* * *

In sum, there is no genuine dispute of fact that Plaintiffs' Fourth Amendment rights were violated on June 16, 2023, when the pipe was cut. Furthermore, Mr. Nicholson is not entitled to qualified immunity because every reasonable officer would have understood that Mr. Nicholson's actions violated the Fourth Amendment. Therefore, the Parksley Motion is **DENIED** as to Count 1, and the Benoir Motion is **GRANTED** as to Count 1.

> 2. *Illegal Search and Seizure against Parksley, in violation of 42 U.S.C. § 1983—Fourth and Fourteenth Amendments (Count 2)*

Having determined that Mr. Nicholson is not entitled to qualified immunity and is personally liable under Count 1, the Court now considers whether Parksley can be held liable for Mr. Nicholson's actions pursuant to *Monell* under Count 2. The Fourth Circuit has identified 4 avenues through which a municipality can be held "responsible" for the actions of its employees:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens;' or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'

*Harris v. Piedmont Reg'l Jail Auth.*, No. 3:24cv799, 2025 WL 2581839, at *7 (E.D. Va. Sept. 5, 2025) (quoting *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)). The Court considers the second avenue to be the most relevant to the present circumstances,

34

and analyzes whether Parksley can be held responsible for Mr. Nicholson's decisions as a person of final policymaking authority.

"If the decision to adopt [a] particular course of action is properly made by [a] government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986). "[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances . . . [and] attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 480–81. "The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Id.* at 482–83.

Here, Mr. Nicholson was officially appointed Supervisor of Parksley Public Works by Mayor Russell pursuant to a March 13, 2023 resolution passed by the Parksley Town Council. Def. Mem. Supp. Ex. 8, ECF No. 57-8; Def. Mem. Supp Ex. 9 at DEF000253, ECF No. 57-9; Nicholson Dep. at 18:06–08. Parksley Public Works and Mr. Nicholson, as its Supervisor, were, at all times relevant, in charge of both Parksley's water and sewer systems. Nicholson Dep. at 213:11–16; Def. Mem. Supp. Ex. 7 at 13:14–17, ECF No. 57-7. As Supervisor of Public Works, Mr. Nicholson directed its employees—such as Mr. McCready—in their daily tasks. Nicholson Dep. at 25:22–26:23; Russell Dep. at 18:01–18. Mr. McCready is an employee of the Parksley Public Works Department. McCready Dep. at 9:10–18. On June 16, 2023, Mr. Nicholson told Mr. McCready to cut Plaintiffs' PVC pipe. McCready Dep. at 12:24–13:03;

35

14:02–14; Nicholson Dep. at 142:24–143:02; Def. Mem. Supp. Ex. 14, ECF No. 57-14. Mr. McCready believed that Mr. Nicholson was instructing him to cut the PVC pipe in Mr. Nicholson's capacity as Supervisor of Public Works. McCready Dep. at 41:14–22. In Defendants' own words, "Parksley understood that [Mr.] Nicholson's actions on June 16, 2023, involving cutting the PVC pipe connection from the EEHFT were undertaken in [Mr.] Nicholson's capacity as the Supervisor of Parksley Public Works, fell within the legitimate scope of that position's duties, and were not motivated by any animus." Def. Mem. Supp. ¶ 64 (citing Taylor Dep. at 60:10–61:07).

While the parties dispute whether animus was present, animus is not required for *Monell* liability. The above facts plainly demonstrate that Mr. Nicholson was the "authorized decisionmaker" of the Parksley Public Works Department. *Pembaur*, 475 U.S. at 481. Mr. Nicholson was in charge of the Parksley water and sewer systems and directed its employees in its daily tasks—he therefore was "the decisionmaker possess[ing] final authority to establish municipal policy with respect to the action ordered"—here, the cutting of the PVC pipe. *Id.* at 481. Therefore, Parksley can be held liable for Mr. Nicholson's actions pursuant to *Monell. See Hunter v. Town of Mocksville*, 897 F.3d 538, 557 (4th Cir. 2018) (imposing *Monell* liability where the town board granted the town manager "carte blanche authority to make formal or informal ad hoc policy choices or decisions." (internal quotation marks omitted)). Therefore, the Parksley Motion as to Count 2 is **DENIED**, and the Benoir Motion as to Count 2 is **GRANTED**.

36

        3.    *Equal Protection Claim against Mr. Nicholson personally, in violation of 42 U.S.C. § 1983—Fourteenth Amendment (Count 3)*

        a.    *Qualified Immunity*

As Defendants alone are moving for summary judgment on Count 3 and as Defendants bear the burden of demonstrating that the alleged violation was not a clearly established right, the Court will begin with the second prong of the qualified immunity analysis. *See Mendes v. Wendling*, No. 5:19cv72, 2021 WL 1113662, at *6 (W.D. Va. Mar. 23, 2021) (finding that defendants were not entitled to qualified immunity because they had not "presented any argument that [plaintiff's] equal protection rights were not clearly established at the time of the alleged violation"). The Court must determine whether there was a clearly established right "that is sufficiently clear such that every reasonable official would have understood that what he is doing violates that right." *Keenan*, 524 F. Supp. 3d at 479 (citation modified). The right at issue here is the right to enjoy equal protection under the law, and to not be singled out by state actors via unreasonable nuisance abatements and verbal harassment. *See* U.S. Const. amend. XIV, § 1 ("No state shall . . . deny to any person within its jurisdiction the equal protection of laws.").

Defendants have not met their burden to show that such right was not clearly established. See Def. Mem. Supp. 27–28 (dedicating 1 paragraph to the equal protection claim and failing to address whether the right at issue is "clearly established"). Supreme Court, Fourth Circuit, and out-of-circuit precedent indicate that when a state actor singles out citizens or businesses, equal protection rights are duly

implicated. *See, e.g.*, *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (recognizing class-of-one claims and holding that a plaintiff may bring an Equal Protection claim where he or she is singled out by state action, even without alleging membership in a protected class); *Willis v. Town of Marshall*, 426 F.3d 251, 263 (4th Cir. 2005) ("[Plaintiff's] allegations of arbitrary singling-out by [a state actor] are sufficient to support an *Olech* 'class of one' claim."); *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (finding animus and a class-of-one equal protection claim where mayor interrupted meetings of plaintiffs and building inspectors and angrily informed building inspectors that no permit should be granted to plaintiffs). Therefore, as Defendants have not met their burden on the second prong of the qualified immunity analysis, Mr. Nicholson is not entitled to qualified immunity on Count 3.

### b.    *Personal Liability*

"To state a § 1983 claim based on an equal protection violation, a plaintiff must show 'that he has been treated differently [by state actors] from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *Lee v. Boyd*, 799 F. Supp. 3d 507, 511 (W.D. Va. 2025) (citing *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). However, the Fourth Circuit has not "dismissed equal protection claims for lack of comparator evidence." *Id.* (citing *Krell v. Braightmeyer*, 828 F. App'x 155 (4th Cir. 2020)). In *Krell*, the Fourth Circuit "did not evaluate whether there was any evidence of a similarly situated comparator but concluded that, based on the defendant's 'alleged refusal to alleviate the plaintiff's pain —a decision punctuated with a vile epithet—the district

38

court properly denied qualified immunity to the officer.'" *Id.* (citing *Krell*, 828 F. App'x at 159) (citation modified). *See also Mark Vogel Acquisitions, LLC v. Prince George's Cnty.*, No. 24cv3008, 2025 WL 2374695, at *6 (D. Md. Aug. 14, 2025) ("A plaintiff may rely on either direct evidence of discriminatory animus or circumstantial comparator evidence to support an equal protection claim." (citing *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818–19 (4th Cir. 1995)).

As only Defendants are moving for summary judgment on Count 3, the Court must view the record in the light most favorable to Plaintiffs. A reasonable factfinder could find that Mr. Nicholson singled out Plaintiffs when he cut their pipe on June 16, 2023, while he was acting under color of state law. Other than with respect to the Plaintiffs, Mr. Nicholson has never cut or instructed someone else to cut another water discharge pipe. Nicholson Dep. at 133:06–08. Mr. Nicholson is not aware of anyone from Parksley's Public Works Department ever cutting anyone's water discharge pipe. *Id.* at 133:20–134:02. VDH itself would never physically cut someone's pipe, even after a violation was definitively found. Pfeiffer Dep. at 40:09–41:19. Furthermore, Parksley's Water/Sewage Ordinance provides an avenue for due process before a nuisance is abated, which was plainly ignored here with respect to Plaintiffs. Def. Mem. Supp. Ex. 19 at 2, ECF No. 57-19. In addition, while the facts of the June 17, 2023 incident remain in dispute, if true—Mr. Nicholson's actions that day would certainly demonstrate animosity and an arbitrary singling-out of Plaintiffs.

"The classic class-of-one claim is illustrated when a public official, with no conceivable basis for his action other than spite or some other improper motive, comes

down hard on a hapless private citizen." *Swanson*, 719 F.3d at 784 (citation modified). In most class-of-one cases, plaintiffs will use similarly-situated individuals to show that they were singled out. *Id.* Here, as the facts of June 16, 2023 and June 17, 2023 are so outlandish, it is difficult for Plaintiffs to specifically name other businesses that *did not* have their pipes cut despite some wastewater issue or *were not* subjected to an angry tirade by a Parksley Town Council member. Accordingly, here, "animus is easily demonstrated but similarly situated individuals are difficult to find." *Id.* at 784 (finding animus and a class-of-one claim where mayor interrupted meetings of plaintiffs and building inspectors and angrily informed building inspectors that no permit should be granted); *see also Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) ("[Plaintiff's] general assertion that other persons were not similarly abused does not require names or descriptions in support."). A reasonable juror could find that animus was present here and that Plaintiffs were arbitrarily singled out. Therefore, especially given that the facts of June 17, 2023 remain in dispute, summary judgment on Count 3 is not appropriate at this time. The Parksley Motion as to Count 3 is therefore **DENIED**.

> 4. *Equal Protection Claim against Parksley, in violation of 42 U.S.C. § 1983—Fourteenth Amendment (Count 4)*

Under Count 4 of the Amended Complaint, Plaintiffs allege that Mr. Nicholson engaged in a pattern and practice of abusive conduct against the Plaintiffs, and that

such conduct was done with the knowledge and consent of other Parksley government officials. *Id.* ¶¶ 306–07.[12]

As discussed above, the Court has already found that summary judgment is not appropriate with respect to the equal protection claim alleged against Mr. Nicholson. *See supra* pp. 37–40. Furthermore, with respect to municipal liability, the Court adopts its prior analysis of Parksley's liability under *Monell*, as set forth above. *See supra* pp. 34–36. Therefore, at this stage, a reasonable factfinder could find that Parksley is liable under *Monell* for an equal protection violation arising from Mr. Nicholson's actions. Accordingly, summary judgment is not appropriate, and the Parksley Motion is **DENIED** as to Count 4.

---

[12] Plaintiffs also allege that they have been "treated differently by Parksley's government officials than other businesses in Parksley." Am. Compl. ¶ 324. Based on the record, it is plausible that Plaintiffs intended to allege *Monell* liability for the actions of Mr. Layne as well, based upon his repeated complaints to VDH that Plaintiffs were in violation of state and environmental regulations. However, in Plaintiffs' response in opposition to the Parksley Motion, they do not address Mr. Layne's actions. Pl. Resp. Opp'n at 21–22, ECF No. 64. Furthermore, Plaintiffs state:

> Defendants' brief also makes disputed statements regarding the supposed dumping of wastewater. *See* [Def. Mem. Supp. ¶¶ 69–75]. Again, **these statements are not material to any of the causes of action** before the Court, as they occurred after June 16, 2023 (the day the pipe was cut) and before October 9, 2023 (the day Mayor Russell made his public statement of non-enforcement). Indeed, if they show anything, it was the unusual lengths to which Councilmembers Nicholson and Layne were willing to go to make false accusations against Plaintiffs.

*Id.* at 10 (emphasis added). Therefore, the Court only considers Mr. Nicholson's actions when assessing Parksley's *Monell* liability pursuant to Count 4.

> 5. *Retaliation against Parksley, in violation of 42 U.S.C. § 1983—First and Fourteenth Amendments (Count 6)*

A plaintiff must establish 3 elements in a First Amendment § 1983 retaliation claim: (1) that the plaintiff's speech was protected; (2) "that the defendant's allegedly retaliatory action adversely affected the plaintiff's constitutionally protected speech"; and (3) "that a causal relationship exists between [the plaintiff's] speech and the defendant's retaliatory action." *Suarez Corp Indus. v. McGraw*, 202 F.3d 676, 685–86 (4th Cir. 2000). However, "proof that the [retaliatory] action was independently justified on grounds other than the improper one defeats the claim." *Wilkie v. Robbins*, 551 U.S. 537, 558 n.10 (2007).

The undisputed material facts show the following. On October 9, 2023, Parksley enacted the Food Truck Ban; however, Mayor Russell announced that Plaintiffs would be permitted to continue operating EEHFT until their business license expired in May 2024. Pl. Mem. Supp. Ex. 19 at 4, ECF No. 59-19. After the enactment of the Food Truck Ban, Plaintiffs began speaking to the media to oppose the ban, which resulted in media coverage on October 19, 2023 and subsequent dates. Bastien Decl. ¶ 73; Benoir Decl. ¶ 77. Also on October 19, 2023, Parksley officials reached out to their attorney, Mr. Wiggins, and asked him to draft a letter informing Plaintiffs that they would no longer be permitted to operate their food truck until May 2024 as had been originally promised. Pl Mem. Supp. Ex. 20, ECF No. 59-20. However, while Mr. Wiggins conducted legal research to draft a letter to Plaintiffs to so inform them, he discovered that the operation of EEHFT was in violation of a preexisting ordinance. Pl. Mem. Supp. Ex. 26, ECF No. 59-26. Therefore, as a legal matter, Plaintiffs were

42

barred from operating EEHFT once Parksley realized that a permanent food truck was not permitted by the Parksley Zoning Ordinance.

Thus, irrespective of the Food Truck Ban, Parksley's decision to renege on its promise that Plaintiffs could operate until May 2024 (which it never had to act upon), and Plaintiffs' media efforts, Parksley had an independent legal basis to require Plaintiffs to cease operation of the EEHFT. Although the record suggests that Mr. Wiggins was initially directed to draft a cease-and-desist letter out of some retaliatory animus, Plaintiffs cannot establish that their protected speech was the but-for cause of the letter which informed them they must cease operating.

The Supreme Court summarized this but-for causation standard in the First Amendment retaliation context:

> It is clear, moreover, that the causation is understood to be but-for causation, without which the adverse action would not have been taken; we say that upon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of . . . [i]f there is a finding that retaliation was not the but-for cause . . . the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind. It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway.

*Hartman v. Moore*, 547 U.S. 250, 260 (2006) (internal citations omitted); *see also, e.g., Papas v. Leonard*, No. 3:10cv550, 2012 WL 1445853, at *11 (D. Or. Apr. 25, 2012) (finding lack of but-for causation where there was some evidence a state agency was motivated to close plaintiffs' business based on protected speech, however, defendants conducted independent inspections of plaintiffs' business and concluded that it

43

contained serious fire and building safety hazards); *Latson v. Clarke*, 249 F. Supp. 3d 838, 864 (W.D. Va. 2017) (finding that plaintiff-inmate sufficiently pled that but-for the exercise of his First Amendment rights, defendant-correctional officers would not have revoked all of his privileges and placed him in solitary confinement, as there was no other punitive or legitimate basis for the inmate's conditions).[13]

---

[13] Plaintiffs argue that "[f]or retaliation claims, what matters is not whether the government could have otherwise refused to grant a permit or could have shut someone down for other, (hypothetically) legitimate reasons, but whether the government *actually would have* shut them down but for the retaliatory conduct at issue." Pl. Resp. Opp'n at 15, ECF No. 64 (citing *Gonzalez v. Trevino*, 602 U.S. 653 (2024); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20 (2d Cir. 2018)). This is a misstatement of the law. Under *Hartman*, 547 U.S. at 260, a retaliation claim fails where the defendant shows the challenged action would have been taken regardless of any alleged retaliatory animus. Additionally, neither case Plaintiffs cite supports their position here.

First, *Gonzalez* concerns retaliatory arrest, a distinct doctrinal context. There, the plaintiff was prosecuted under an anti-tampering statute after engaging in protected political speech and putting a document in a binder. 602 U.S. at 656–57. She presented evidence that no one had previously been arrested for similar conduct and argued that she was being subjected to a "sham charge." *Id.* at 657. Generally, the presence of probable cause defeats a First Amendment retaliatory arrest claim. *Nieves v. Bartlett*, 587 U.S. 391, 405 (2019). However, the Supreme Court created an exception to this general rule in *Nieves* when it held that a plaintiff can prevail on a retaliatory arrest claim even where there is probable cause if the plaintiff produces "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 407. In *Gonzalez*, the Supreme Court found that the *Nieves* exception applied to the plaintiff because she presented such comparator evidence. *Gonzalez*, 602 U.S. at 658. The instant case is not a retaliatory arrest case, like *Gonzalez*. Furthermore, even if *Gonzalez* were applicable, Plaintiffs have not presented evidence that Parksley declined to enforce its zoning ordinance against similarly situated violators. Although Plaintiffs operated the first permanent food truck in Parksley, *Gonzalez* made clear that Plaintiffs do not have to present evidence of "virtually identical and identifiable comparators." *Id.* Plaintiffs have not presented any evidence of zoning ordinance violators in Parksley against whom such ordinances were not enforced. Therefore, *Gonzalez* is inapplicable.

Second, *Wandering Dago* addresses a selective enforcement claim, which requires proof that (1) the plaintiff was "treated differently from other similarly situated businesses and (2) that such differential treatment was based on impermissible

44

Therefore, although Plaintiffs have demonstrated that Parksley intended to punish them for their protected speech, and indeed prepared to do so, they have not demonstrated that their speech was the but-for reason that EEHFT is no longer operating today. Though the Court finds the sequence of events here unsavory, Parksley's initial bad motives do not account for a constitutional tort under these circumstances. *Hartman*, 547 U.S. at 260. Therefore, no reasonable juror could find, as a matter of law, that Parksley retaliated against Plaintiffs in violation of their First Amendment rights. Accordingly, the Parksley Motion is **GRANTED** as to Count 6, and the Benoir Motion is **DENIED** as to Count 6. Count 6 is **DISMISSED**.

### B. State Law Claims: Trespass to Land and Trespass to Chattels against Mr. Nicholson Personally (Count 5)

#### 1. *Trespass to Land*

"To state a claim for trespass under Virginia law, a plaintiff must establish: (1) he or she had possession of the affected land at the time of the trespass, (2) there was a physical invasion that interfered with the right to exclusive possession, and (3) the

---

considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." 879 F.3d at 40. In that case, the defendants did not dispute that they denied a food truck's application to participate in a lunch program based on plaintiffs' protected speech. *Id.* The defendants argued, however, that their additional basis for denying the application was that the food truck failed to submit its complete application on time. *Id.* However, the record showed that other food trucks who had submitted late or incomplete lunch program applications *were* approved. *Id.* Therefore, the plaintiffs demonstrated that its "differential treatment was based on intent to inhibit or punish the exercise of constitutional rights." *Id.* (cleaned up). Here, Plaintiffs have offered no evidence that the Parksley Zoning Ordinance was enforced against them and not against similarly situated businesses. Absent such evidence, Plaintiffs cannot make out a selective enforcement claim under the First Amendment—nor have they meaningfully advanced a selective enforcement theory in their briefs, with the exception of citing this case. *Wandering Dago* is therefore inapplicable.

invasion was the direct result of some act committed by the defendant." *Cook v. VA Powhatan 60, LLC*, No. 3:24cv434, 2025 WL 259202, at *3 (E.D. Va. Jan. 21, 2025). (cleaned up). Plaintiffs argue that Mr. Nicholson trespassed on their land on June 16, 2023, when he entered their property and caused their pipe to be cut. Pl. Mem. Supp. at 23–24, ECF No. 59. Defendants argue that Mr. Nicholson had the right to enter the land, as it was within the scope of his work as the Supervisor of Public Works. Def. Mem. Supp. at 28–29.

"[S]overeign immunity does not protect municipal employees who commit intentional torts, irrespective of whether they acted within or without the scope of their employment." *Greene v. City of Portsmouth*, No. 1461cv22, 2024 WL 1160681, at *16 (Va. Ct. App. Mar. 19, 2024) (cleaned up). Trespass of land is an intentional tort, and Mr. Nicholson is therefore not entitled to sovereign immunity for this claim.

However, the parties dispute whether Mr. Nicholson was on public property when the pipe was cut, and dispute whether he was later invited onto the property by Mr. Benoir. *See* Def. Mem. Supp. ¶ 57; Bastien Decl. Opp'n ¶ 18. Therefore, there is a disputed issue of material fact as to the trespass to land claim. Accordingly, the Parksley Motion and the Benoir Motion are both **DENIED** as to Count 5 with respect to the trespass to land claim.

### 2.    *Trespass to Chattels*

Trespass to chattel under Virginia law occurs "when a party intentionally uses or intermeddles with personal property in the rightful possession of another without authorization." *Michael Pellis Architecture PLC v. M.L. Bell Constr. LLC*, 693 F.

Supp. 3d 594, 607 (E.D. Va. 2023) (internal quotation marks omitted). A plaintiff may establish a claim for trespass of chattels in 1 of 4 ways: "(1) dispossessing the other of the chattel, (2) impairing the chattel's condition, quality or value, (3) depriving the possessor of the chattel for a substantial period of time, or (4) causing bodily harm to the possessor or to some person or thing with which the possessor has a legally protected interest." *Johnson v. Westlake Flooring Co., LLC*, 744 F. Supp. 3d 622, 631 (E.D. Va. 2024). Here, Mr. Nicholson directed Mr. McCready to cut the PVC pipe on June 16, 2023, and therefore intermeddled with Plaintiffs' personal property and impaired the chattel's condition.[14]

Defendants put forth 2 defenses to Plaintiffs' claim of trespass to chattels—(1) sovereign immunity; and (2) unclean hands. Def. Mem. Supp. at 29–30. Mr. Nicholson is not entitled to sovereign immunity for the intentional tort of trespass to chattels as stated above. *See supra* p. 46. With respect to unclean hands, Defendants assert that "[n]otwithstanding its Parksley business license, EEHFT had no legal right to be operating in Parksley on June 16, 2023 . . . because it was a violation of the Town's Zoning Ordinance . . . and a connection from the food truck to an external storage tank was not permissible according to VDH." Def. Mem. Supp. at 29 (citing *Segaloff*, 163 S.E.2d at 135).

---

[14] It is of no import that Mr. Nicholson himself did not cut the pipe on either occasion. Defendants have been found liable for trespass to chattels wherein they directed another person to commit the trespass. *See Johnson*, 744 F. Supp. 3d at 631 (denying defendant's motion to dismiss for trespass to chattels where defendant directed another party to repossess the vehicle).

Defendants cite *Segaloff* for the proposition that a permit issued in violation of an ordinance "confers no greater rights upon a permittee than an ordinance itself, for the permit cannot in effect amend or repeal and ordinance." *Id.* at 20 (citing *Segaloff*, 163 S.E.2d at 137). In essence, Defendants are arguing that because Mr. Benoir and Ms. Bastien should not have been issued a permanent business license for EEHFT in the first place due to the Parksley Zoning Ordinance, Mr. Nicholson had the right to cut the PVC pipe.

As was previously explained *supra* p. 24 n.10, the comparison to *Segaloff* is inapposite. In *Segaloff*, the plaintiff was issued a permit for a commercial store and a canopy leading into that store. *Segaloff*, 163 S.E.2d at 136. After it was discovered that the permit was issued in violation of an ordinance, the Court ordered that the permit be revoked and that the canopy structure be removed—despite the unnecessary hardship it would put on the store-owner plaintiff given that he had expended more than 3,000 dollars in reliance upon the permit for the canopy having been issued. *Id.* In no way does *Segaloff* stand for the proposition that an improperly-issued permit authorizes municipal officials to commit intentional torts against the property that is the subject of the permit. Furthermore, *Segaloff* is no longer good law. *See supra* p. 24 n.10.

With respect to Defendants' asserted defense that "a connection from the food truck to an external storage tank was not permissible according to VDH," and that Plaintiffs therefore had unclean hands, the Court fails to understand how alleged lack of compliance with a VDH policy provides a defense to an intentional tort such

48

as trespass to chattels. Defendants have provided no authority for the Court to so find.

Therefore, Defendants' unclean hands defense is meritless. As the Court finds that Mr. Nicholson did indeed trespass upon Plaintiffs' chattels and has presented no defense for so doing, the Parksley Motion is **DENIED** as to Count 5 with respect to trespass to chattels, and the Benoir Motion is **GRANTED** as to Count 5 with respect to trespass to chattels.

## V.    CONCLUSION

For the foregoing reasons, the Parksley Motion (ECF No. 56) is **GRANTED in part** and **DENIED in part**. The Parksley Motion is **DENIED** as to Counts 1, 2, 3, 4, and 5, and **GRANTED** as to Count 6. Count 6 is hereby **DISMISSED**. Counts 2 and 4 are also **DISMISSED** as to Mr. Nicholson. The Benoir Motion (ECF No. 58) is **GRANTED in part** and **DENIED in part**. The Benoir Motion is **GRANTED** as to Counts 1, 2, and 5 with respect to trespass to chattels. The Benoir Motion is **DENIED** as to Count 5 with respect to trespass to land and Count 6.

Therefore, the remaining counts at issue are Counts 3, 4 (as to Parksley), and 5 (trespass to land only). The Clerk is **REQUESTED** to forward a copy of this Order to counsel of record for all parties.

**IT IS SO ORDERED.**

_____/s/_____<br>
Arenda L. Wright Allen<br>
United States District Judge

March 31, 2026<br>
Norfolk, Virginia

49